**EXHIBIT**

F

# CVS Caremark:
# An Alarming Prescription

How CVS Caremark may be putting patient privacy at risk, putting profits over patient health, and taking advantage of its clients.





Prepared November 2008 by: **Change to Win & Alarmed About CVS Caremark**

# CHANGE to WIN

**Change to Win** is a six million member partnership of seven unions founded in 2005 to represent workers in the industries and occupations of the 21st century economy. Change to Win is committed to restoring the American Dream for a new generation of workers—wages that can support a family, affordable health care, a secure retirement, and opportunity for the future.

**www.ChangeToWin.org**



**Alarmed About CVS Caremark** is a Change to Win initiative to educate health plan managers and trustees as well as consumers about the newly merged CVS Caremark, now the country's second largest pharmacy benefits manager (PBM) and largest retail pharmacy chain. This report details the troubling patterns exhibited by both CVS and Caremark prior to their merger, and explores the new risks presented by the merged entity CVS Caremark, in such vital areas to health plans and consumers as patient privacy, patient health versus PBM profits, value to plans, conflicts of interest, and quality of service. Change to Win represents workers in CVS Caremark plans that cover more than 10 million people. On behalf of these health plan members, our initiative seeks legislative reform of the PBM industry to protect plan members' health and privacy.

**www.AlarmedAboutCVSCaremark.org**

*Contact Info:*

**info@alarmedaboutcvscaremark.org**

**(888)-790-0849**

"Former employees, federal and state prosecutors, academics and even some former customers say that Caremark has built its success on overly aggressive (some say illegal) business practices and on the unregulated, opaque and secretive nature of its business."



Sidney Wolfe, director of the health research group at Public Citizen, said, "If CVS is getting into this [merger with Caremark] because they think they can increase their profits by acquiring and controlling the PBM, it might be very good for CVS, but it's hard to imagine how it is good for the public." Wolfe added, "There is no evidence this kind of thing passes money onto patients."



"If you're a payer for healthcare, you've got to wonder if you're going to be getting as good a deal with CVS [Caremark]," said Richard Frank, professor of healthcare policy at Harvard Medical School, in response to the CVS-Caremark merger announcement. "I'd think twice about doing business with them."



Keith Bruhnsen, Assistant Director of the University of Michigan's Benefits Office, thought Caremark was sometimes steering Michigan employees toward drugs for which it got rebates instead of the ones that would save the university the most money. "The drugs that they had negotiated rebates on were not best-value drugs," he says. The University ended its relationship with Caremark in 2006.



Sean Brandle, national pharmacy practice leader at the employee benefits consulting firm Segal, says a major reason for CVS' acquisition was the need to make up for customers it has lost over the years due to the rise of mail-order pharmacies operated by PBMs. "This is a good way for CVS to funnel Caremark members into their stores and sell them chips and soda when they go to fetch their prescriptions," he says.



# CVS Caremark: An Alarming Prescription

*How CVS Caremark may be putting patient privacy at risk, putting profits over patient health, and taking advantage of its clients*

## TABLE OF CONTENTS

Executive Summary .............................................................. 4

Introduction.................................................................. 7
    A. Understanding the Role of Pharmacy Benefit Managers ................................... 7
    B. CVS Caremark: America's Largest Source of Prescription Drugs........................... 7

I. Repeated Accusations of Drug Favoring and
   Drug Switching That Put Profits Ahead of Health ............................ 9
    A. The Company Has Repeatedly Promised Regulators It Will Reform,
       but Evidence Suggests It Has Not ...................................................... 11
    B. On-Going Reports of Drug Switching................................................... 11
    C. CVS Caremark Incentivizes Drug Switching In Both Its Mail
       Order Pharmacies and Its Network of Retail Pharmacies.................................. 13

II. Troubling Questions About CVS Caremark's
    Access To and Use of Private Patient Data .................................. 15
    A. Selling Private Personal Data ........................................................ 15
    B. Using Patient Data to Market for Drug Companies....................................... 16
    C. Information Hungry: Continually Seeking More Personal Data ............................ 18
    D. Failing to Protect Patient Privacy in the Retail Setting .................................. 18

III. Secrecy in CVS Caremark's Business
    Practices Hinders Accountability.......................................... 19
    A. CVS Caremark's Restrictions on Audits May Limit Its Accountability to Plans ............. 20
    B. CVS Caremark Has Lost Business for Protecting Its Secrets .............................. 21
    C. Fighting To Keep PBMs' Secrets On All Fronts........................................... 23

IV. CVS Caremark: A Bad Deal for Health Plans and Employers?.............. 25
    A. Plans Save Millions After Dropping CVS Caremark...................................... 26
    B. CVS Caremark Has Repeatedly Been Accused of Cheating Plans.......................... 27

V. Repeated Accusations of Fraud and Service Issues for CVS Caremark . . . . . 29
   A. CVS Caremark Charged With Repackaging, Reselling Returned Drugs . . . . . . . . . . . . . . . . . . . . . 29
   B. CVS Caremark Customers Complain of Poor Service and Other Questionable Practices. . . . . . . . . 31

VI. The CVS-Caremark Merger: Expanding the Risks for Plans and Patients . . . 33
   A. The Merger Could Increase Service Problems for Plans and Members . . . . . . . . . . . . . . . . . . . . . 33
   B. The Merger Creates New Conflicts of Interest within CVS Caremark. . . . . . . . . . . . . . . . . . . . . . 34
   C. The Merger and Its Focus on Retail Selling Pose Risks for Patient Health . . . . . . . . . . . . . . . . . . 36
   D. The Merger Creates More Opportunities for Improper Drug Switching. . . . . . . . . . . . . . . . . . . . . 37
   E. The Merger Greatly Exacerbates Privacy Concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Appendix A: How PBMs Work. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Appendix B: CVS Caremark Pricing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Endnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Endnotes: Appendix B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

# Executive Summary

I n 2007, CVS, the country's largest chain of retail pharmacies, merged with Caremark, the country's second-largest pharmacy benefits manager (PBM). The combined company—now known as CVS Caremark—has relationships with over 150 million Americans, and is the largest provider of prescriptions in the United States, filling or managing more than 1.2 billion prescriptions annually. Unfortunately for health care consumers, there are several reasons why the CVS-Caremark merger and the combined company's enormous power should be a cause for alarm.

## Repeated Accusations of Drug Favoring and Drug Switching That Put Profits Ahead of Health

Numerous sources have accused CVS Caremark of improperly switching patients to drugs different from the one their doctor prescribed in ways that cost patients and their health plans more money, of switching patients to less effective drugs without adequate regard for patient health, and of switching patients' drugs without their doctors' approval.

**In just the first six months of 2008, the Company paid over $75 million to settle lawsuits that included drug-switching claims.**



**CVS Caremark Has Most Covered Lives**

CVS Caremark (95)

Medco (60)

Express Scripts (50)

*Covered lives shown in millions.*

As Creighton University Pharmacy Professor Robert Garis has said: "With respect to Caremark it seems like they are sacrificing patient care for profits."

## Troubling Questions About CVS Caremark's Access to and Use of Private Patient Data

CVS Caremark has unprecedented access to patients' private information: it is estimated to have access to data on approximately 30% of all prescriptions in the country. Yet the Company has repeatedly been accused of disregarding patient privacy by selling or sharing patient data and improperly handling patients' medical and other private information.

CVS Caremark has disregarded patient privacy in basic ways: its retail stores have been caught dumping unaltered patient information—including names, addresses, dates of birth, types of medications, and credit card numbers—into publicly accessible trash containers at its retail stores in several states.

## Secrecy in CVS Caremark's Business Practices Hinders Accountability

CVS Caremark has taken extraordinary measures to prevent disclosure of its practices. For example, although audits can expose costly errors or fraud by PBMs and reap big benefits for health plans, CVS Caremark limits plans' ability to conduct meaningful audits, allowing the Company to keep important information from plans, including drug pricing and the amount and source of fees and other revenues it receives from drug manufacturers and other companies.

CVS Caremark has even lost several major clients—including the State of Illinois, the State of Maryland, and the University of Michigan—in part because of its resistance to transparency. The Company has also opposed state and federal efforts to increase PBM transparency and require disclosure of rebates and other revenue agreements.

## CVS Caremark: A Bad Deal for Health Plans and Employers?

CVS Caremark earns significantly more profits from its clients on each prescription it fills than do its biggest competitors, and many employers and health plans have saved millions of dollars by dropping CVS Caremark. For example, after switching from CVS Caremark to another PBM in 2006, the State of Illinois estimated that it would save $120 million over five years.

Several CVS Caremark clients have accused the Company of withholding money that the clients were entitled to, or engaging in deceptive or fraudulent practices that ended up costing clients more, leading to a number of lawsuits and settlements.

## Repeated Accusations of Fraud and Service Issues for CVS Caremark

Many health plans have had alarming experiences with misconduct by CVS Caremark. Some have experienced problems so serious they felt compelled to sue CVS Caremark to enforce their rights and protect their members. In these lawsuits, many of which the Company settled, plans have alleged that the Company: put patient health at risk by improperly reselling returned medications and deceiving plans about these practices; engaged in fraud under its contracts or government programs; and provided service so deficient that plans switched to other PBMs mid-contract.

As just one example, in February 2008 CVS Caremark agreed to pay $38.5 million to 28 states and the District of Columbia to settle allegations that included restocking and reselling returned drugs.

## The CVS-Caremark Merger: Expanding the Risks for Plans and Patients

The CVS-Caremark merger has the potential to create a host of problems for the plans and patients the Company serves. Some of the risks presented by the merger include: disruptions caused by conflicts between

## CVS Caremark by the Numbers

**80 billion dollar company**

**1.2 billion prescriptions filled annually**

**50 million ExtraCare cardholders**

**6,300 retail stores**

## CVS Caremark Touches One out of Every Two Americans



*CVS Caremark gives prescription or health services to half of all Americans.*

CVS Caremark and retail pharmacies that compete with CVS; increased incentives and expanded opportunities for the Company to engage in drug switching; increased dangers to patient privacy because of the Company's unprecedented access to patients' personal information and new programs to use patient information for marketing programs; and potential risks to patient health as the Company attempts to entice its PBM customers into its retail stores to purchase items—such as cigarettes, alcohol, and junk food—that undermine health care goals. Thus, as Doctor Sidney Wolfe, Director of Public Citizen's Health Research Group, has said: "[This merger] might be very good for CVS, but it's hard to imagine how it is good for the public."

## Recommendations

There are three steps PBM clients should take to protect themselves from the problems that CVS Caremark clients have encountered.

- First, plans should be very careful in drafting their PBM contracts to ensure that they can track how every dollar they pay their PBM is spent.

- Second, plans should regularly audit their PBM's performance to make sure they are receiving the deal they were promised in the bid process.

- Finally, plans should take an active role in improving the PBM industry by being involved in legislative efforts that would address common problems in a systematic way.

# Introduction

## A. Understanding the Role of Pharmacy Benefit Managers

Prescription drugs are becoming increasingly important in modern medical care. For patients, getting the right drug at an affordable price is a serious medical issue. At the same time, spending on prescription drugs is rising rapidly, having increased from $40.3 billion in 1990 to $216.7 billion in 2006.[1] Amidst the rising costs and increasing importance of prescription drugs, most consumers are unaware that a few large companies—pharmacy benefit managers (PBMs)—play a central role in deciding which drugs patients obtain and how much they cost.

Pharmacy benefit managers are middlemen that employers and health insurers hire to administer their prescription drug benefit programs.[2] (See Appendix A for more on how PBMs work.) PBMs manage prescriptions for roughly 95% of Americans with prescription drug coverage, and three companies—Medco, CVS Caremark, and Express Scripts—dominate the PBM market, managing drug benefits for over 230 million Americans.

## B. CVS Caremark: America's Largest Source for Prescription Drugs

> **The fact is that we now have, within our enterprise, unmatched access to critical information about our customers, regarding for example, their prescription history, their allergies, their disease states[,] [c]ombined with a myriad of touch points where we directly interact with or influence customers.**
> *Jon Roberts, CVS Caremark Senior Vice President and Chief Information Officer*[3]

In March 2007, Caremark, the second largest PBM, merged with CVS, the country's largest chain of retail pharmacies.[4] With the completion of the merger, CVS Caremark—as the company is now known—became the largest provider of prescriptions in the United States, filling or managing more than 1.2 billion prescriptions annually. CVS Caremark also has more retail drugstores (6,300), more retail health clinics (over 500), more active cardholders in its retail loyalty program (over 50 million), and more pharmacists and nurse practitioners than any other company in the nation.[5] The combined drugstore-PBM giant has relationships with over 150 million consumers, one of every two Americans.[6] CVS Caremark's mammoth size and scope give it unmatched ability to influence consumers, health plans, doctors, and drug manufacturers, and to compile unprecedented levels of personal information about its customers. As the Company boasts, "this is just the tip of the iceberg. Our new integrated model ... allows us to offer services to our customers and clients that no one else in America can offer."[7]

For health care consumers, the CVS-Caremark merger and the combined company's enormous power should be of grave concern, particularly in light of Caremark's troubling history as a pharmacy benefits manager. **"Former employees, federal and state prosecutors, academics and even some former customers say that Caremark has built its success on overly aggressive (some say illegal) business practices and on the unregulated, opaque and secretive nature of its business."**[8] This report details Caremark's past and current alleged abuses in several areas, including improperly switching patients' drugs to increase its profits (Part I),

misusing or mishandling private patient data (Part II), shrouding its practices in secrecy and hindering accountability (Part III), questionable pricing practices (Part IV), and providing poor service (Part V).

The final section of the report (Part VI) focuses on the merger between Caremark and CVS and why health plans and patients alike should be alarmed at the combination. CVS Caremark expects to use the merger to take advantage of opportunities for cross-marketing, in particular by leveraging the Company's expanded access to patient data to drive Caremark patients into CVS retail stores to expand the overall sale of retail products.[9] These new business objectives—and the new opportunities to pursue them created by the merger—enhance conflicts of interest already faced by Caremark and present real risks that plans and patients will be the ultimate losers in the CVS-Caremark merger. As explained in the final section of this report, the merger is likely to exacerbate the past abuses experienced by Caremark clients and present new dangers to plan members, as the Company exploits its increased market power and access to customer data to increase its profits, possibly at the expense of plans' affordable prescription coverage and their members' health.

# I. Repeated Accusations of Drug Favoring and Drug Switching That Put Profits Ahead of Health

**P**BMs have tremendous influence over which drugs patients receive, not only through choosing which drugs to place on the formulary lists of "preferred" drugs for plan members, but also through a practice known as drug switching. Drug switching is when a doctor prescribes one drug and the patient is switched to a different drug.

While substituting an equivalent generic drug for a brand name drug is a well established money-saving practice that many state and federal health care programs have adopted, CVS Caremark and its predecessor companies have been repeatedly accused of favoring drugs and improperly switching drugs in ways that actually cost patients and plans more money, as described below. CVS Caremark has a monetary incentive to switch patients' prescriptions where the substituted drug has a higher rebate value or markup than the originally prescribed drug. The Company has also allegedly switched patients to less effective drugs without adequate regard for patient health, or switched patients without their doctor's approval, which may interfere with the doctor-patient relationship and violates dispensing laws in a number of states.

In the last four years, CVS Caremark (including its legacy PBM companies) has settled several government fraud suits alleging improper drug favoring and drug switching activities, including:

- **Misleading doctors** by telling them they would save their patient or the plan money by prescribing certain drugs, when in reality the drugs would cost the patient and/or plan as much or more but would result in greater profit for CVS Caremark.

- **Providing misleading, incomplete, or false information** to induce either a patient or physician to agree to a drug switch.

- **Switching Medicaid patients to a more expensive form of a drug.**

**In just the first six months of 2008, the Company paid out over $75 million to settle lawsuits that included drug-switching claims.** In February 2008, the Company agreed to pay $38.5 million and entered into settlements with 28 states and the District of Columbia over extensive false claims allegations that included improper drug switching.[10] And in March 2008, CVS Caremark agreed to pay nearly $37 million to 23 states, the District of Columbia, and the federal government to settle claims that CVS improperly switched Medicaid patients to a more expensive form of an antacid, Ranitidine, to increase profits. According to the governments' allegations, the improper Ranitidine switches cost taxpayers as much as 400% more for each prescription than the originally prescribed form of the drug.[11]

Additional allegations and evidence suggest that some improper drug switching may actually be paid for and encouraged by drug manufacturers. A massive federal false claims lawsuit brought by the U.S. Department of

## State Settlements Alleging CVS Caremark's Improper Drug Switching

States that were parties to the February 2008 settlement with 28 states and the District of Columbia over extensive false claims allegations that included improper drug switching:
Illinois, Maryland, Arizona, Arkansas, California, Connecticut, Delaware, District of Columbia, Florida, Iowa, Louisiana, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nevada, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, and Washington

States that were parties to the March 2008 settlement with 23 states, the District of Columbia and the federal government to settle claims that CVS improperly switched Medicaid patients to a more expensive form of an antacid, Ranitidine, to increase profits:
Alabama, Connecticut, Florida, Georgia, Indiana, Illinois, Kentucky, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, Tennessee, Vermont, Virginia, and West Virginia



Justice initially against Caremark's predecessor, AdvancePCS, and settled by Caremark for $137 million in 2005, alleged that AdvancePCS carried out a program of soliciting and accepting payments from drug manufacturers to promote certain drugs to physicians and plans.[12] AdvancePCS allegedly represented to doctors and plans that the drugs were cheaper or more effective or both, when the drugs they encouraged patients to use were actually more costly or less efficacious.[13] The multiple state deceptive practices suits settled by CVS Caremark in early 2008 contained similar allegations.[14]

Moreover, the federal false claims lawsuit alleged that one program used extensively by AdvancePCS, its *Clinical Consulting* program, was key to the company's practices to persuade doctors to prescribe more expensive drugs to their patients.[15] This is a program that CVS Caremark continues to use. Through its current *Clinical Consulting* program, CVS Caremark sends hundreds of pharmacists out to meet in person with more than 20,000 physicians an average of eight times a year, review the doctors' prescribing habits, and promote specific drugs.[16] Additionally, through its *RxReview* program, the Company sends newsletters and even personalized letters to doctors with "actionable, plan participant-specific information" touting specific brand name drugs.[17] Caremark itself acknowledges that "*Rx Review* materials are sponsored by pharmaceutical manufacturers."[18]

These programs are generally promoted to plans as additional services CVS Caremark provides to its client plans "at no additional charge." In fact, many of these programs are directly sponsored by pharmaceutical manufacturers and plans are often unaware of how much money CVS Caremark is making off these programs because the Company does not disclose the amount of this revenue source or share it with clients.[19]

Because of possible drug manufacturer influence, even where the Company does obtain the proper physician authorization for drug switches, it is still unclear whether such switches are to the best and most economical

drugs for plans and their members, because the true costs are often not disclosed, and drug manufacturer payments, especially volume-based rebates, create powerful incentives for CVS Caremark to promote switches even if they are not in their clients' best interests.[20]

## A. The Company Has Repeatedly Promised Regulators It Will Reform, but Evidence Suggests It Has Not

As an outgrowth of the many lawsuits it has faced, today CVS Caremark operates under several legal agreements with state and federal agencies that require extensive changes in its behavior and systems for ensuring compliance with legal and ethical standards.

Specifically, since 2005, as part of the $137 million false claims settlement with the federal government, CVS Caremark has operated under a Consent Order with the U.S. Department of Justice and the U.S. Attorney's Office for the Eastern District of Pennsylvania, as well as a Corporate Integrity Agreement with the Office of the Inspector General of the U.S. Department of Health and Human Services.[21] These agreements govern, among other things, the Company's practices involving rebates from drug manufacturers, management of its formulary and preferred drug lists, contracts with retail pharmacies, and drug interchange programs until September 2010.[22]

In February 2008, as part of the $38.5 million settlement with 28 states and the District of Columbia, CVS Caremark entered into similar agreements covering many of the same activities, which will bind it until 2013.[23] And in March 2008, CVS Caremark entered an agreement that covers drug switching with the Office of the Inspector General of the U.S. Department of Health and Human Services as a part of its $36.7 million Ranitidine Medicaid Settlement.[24]

The 2005 Consent Order with the federal government explicitly prohibits the Company from changing patient drugs "absent express verifiable authorization from the Prescriber," and requires that when it does switch a patient's drug, it must clearly communicate the change to the patient and give them easily understandable information on how to decline a switch and get the drug originally prescribed by their doctor.[25] The 2008 consent orders with multiple states similarly prohibit the Company from engaging in improper drug switching.

**In spite of these promises to regulators, there is evidence that the Company may still be violating these rules.** As described below, CVS Caremark continues to face new lawsuits and other accusations that it still engages in improper drug switching. Moreover, some of its current practices, such as paying pharmacists to switch patients' drugs, incentivize drug switching.

## B. On-Going Reports of Drug Switching

In April 2007, CBS-TV affiliate KHOU in Houston aired an investigative report including extensive interviews with several Caremark patients and former Caremark employees who complained of improper drug-switching at Caremark. The former employees claimed that improper drug switching was routine at the Company's San Antonio call center.[26]

James Reberry, a former CVS Caremark employee who claims he was fired for exposing the Company's drug-switching practices, said: "The patient would say the doctor's office didn't approve it and the doctor's office themselves would say they didn't even approve the change." Reberry said he would then follow up with the doctor's office to find out who authorized the switch, but would often find that the name of the person that CVS Caremark had recorded as authorizing the switch didn't even exist.[27]

"I think it compromises patient care. It makes me mad," said Robert Garis, a practicing pharmacist for over twenty years and professor at Creighton University. "With respect to Caremark it seems like they are sacrificing patient care for profits."[28]

CVS Caremark patients continue to complain of unauthorized drug switches. In 2007, two years after the Company's first Corporate Integrity Agreement and Consent Order promising to rein in its drug-switching practices, CVS Caremark patients—responding to a Company survey—were still complaining about the Company improperly switching their drugs and putting their health at risk. Some examples of these complaints are included below.

> "The prescription was modified, and it was stated that the modification was done in consultation with my doctor's approval. When I consulted my doctor's office they had no knowledge of the approval of the modification to the prescription and my doctor was very upset. This has happened several times in the past several years, and when it happens it takes about 2-4 months to fix this every time."[29]

> "They need to alert the members before any substituting. They have not done that in the past. I am allergic to some of the fillers."[30]

> "Sometimes they change my prescriptions out of the blue without asking me."[31]

> "They didn't do what the doctor prescribed them to do numerous times."[32]

> "They decided to call my doctor and get my prescription changed and the medication didn't work. [I] had to make [a] doctor's appointment while in agony because they changed my medication and it didn't work."[33]

> "They keep calling my physician and telling him what to put me on. They don't know what's good for me and they change my prescription to something that is not healthy for the sickness I have, and I am getting really ticked off!"[34]

CVS Caremark is currently involved in at least two pending lawsuits that include drug switching charges:

1. State of California ex rel. Fowler v. Caremark Rx, Inc.: A case brought by internal whistleblowers alleges that CVS Caremark engaged in fraudulent intervention or switching practices: "On a regular basis, Caremark's representatives never obtain doctor approval or other authorized approval from the doctor's office to make a conversion."[35] Even worse, the suit alleges that the Company would call back doctors' offices that had already indicated that CVS Caremark was not authorized to make changes to the patient's prescription and if they were able to "get anyone at the doctor's office to agree to the requested change to that prescription, including a receptionist, they would override the doctor's original stated

directive," throw away the original fax containing the doctor's prohibition against changes, and make sure there were no corresponding computer records.[36]

2. Southeast Pennsylvania Transportation Authority v. Caremark PCS Health L.P.: The suit alleges, among other things, that "Caremark improperly switched SEPTA members from low cost drugs to higher cost drugs."[37]

## C. CVS Caremark Incentivizes Drug Switching In Both Its Mail Order Pharmacies and Its Network of Retail Pharmacies

CVS Caremark provides financial incentives to pharmacists at non-CVS pharmacies to engage in drug switches and other activities when serving CVS Caremark customers.

**One of its most troubling practices is offering pay incentives to pharmacists as a reward for switching patients' drugs.** In manuals CVS Caremark distributed in May 2007 to pharmacies in its PBM network, the Company explained that its Performance Drug Program (PDP) "offers an additional source of income for Providers (e.g., pharmacists). Service payments range from $2.00, for discussing an alternative therapy with an Eligible Person, to $12.00 for completion of all services related to a successful intervention."[38] In other words, CVS Caremark will pay pharmacists for each drug switch they attempt and even more for drug switches they successfully execute. An excerpt from the manual, below, outlines this troubling practice:

### PDP Fees[39]
A service fee is paid for each step in the intervention process. The total of the different fees to be paid, in addition to normal dispensing fees, is transmitted at the time of service.

| | SERVICE PERFORMED | SERVICE FEE |
|---|---|---|
| Step 1 | **Deliver PDP information and Tear-Off Sheet to eligible Person** | $2.00 |
| | Discuss program with Eligible Person and disclose Provider compensation | |
| | Eligible Person agrees of does not agree | |
| | Send appropriate PPS codes | |
| Step 2 | **Gain Prescriber approval for intervention** | $2.00 |
| | Explain purpose of the call to the Prescriber and disclose Provider Compensation and make other required disclosures | |
| | Prescriber Agrees to interchange | |
| | Prescriber does not agree to interchange:fill/refill original prescription | |
| | Send appropriate PPS codes | |
| Step 3 | **Review specifics of eligible Person involved** | $2.00 |
| | Answer additional Prescriber's questions about therapeutic issues applicable to this Eligible Person | |
| | Document Prescriber's instructions | |
| | Document new prescription and instructions on hard copy or computer | |
| Step 4 | **Contact Eligible Person again** | $2.00 |
| | Dispense Performance Drug | |
| | Send claim to Caremark with appropriate PPS codes | |

The KHOU investigative report mentioned above and lawsuits against CVS Caremark allege that the Company also incentivizes employees at its call centers to switch members' prescriptions through an extensive rewards program. According to these allegations, the Company promised to provide material rewards to employees based upon how many times they could convince doctors' offices (including receptionists) to approve changes

to prescription drug orders.[40] These allegations are echoed in the *Fowler* Complaint: "These rewards included 'Gold Coins' that could be redeemed for material possessions, including DVDs and other electronic equipment or gift certificates to buy such equipment; amusement park passes; clothing; and movie tickets."[41]

CVS Caremark continues to operate programs that lend themselves to drug switching, some of which are funded by drug companies:

*Clinical Consulting*: CVS Caremark sends out hundreds of pharmacists to visit with doctors in person to conduct marketing of specific drugs.

> "We currently employ more than 450 field-based clinical pharmacists nationwide to support and promote our clinical programs directly to physicians through our Clinical Consulting program. This is the largest— and the only national—academic detailing program maintained by a pharmacy and health benefit management services provider."[42]

This method is effective because, as CVS Caremark itself says, research has shown that doctors who are unwilling to listen to drug company sales representatives are willing to speak to pharmacists:

> "According to a recent independent physician survey, the average discussion a Clinical Consultant has with a physician lasts 12 minutes—compared to the 2 to 3 minutes typically allotted by physicians to pharmaceutical sales representatives."[43]

*RxReview*: "RxReview is a physician education program that incorporates educational materials with certain actionable plan participant data" from the Company. "Rx Review materials are sponsored by pharmaceutical manufacturers."[44]

These enhancement programs are not always well received by the people they are intended to influence. In August 2008, a Phoenix newspaper reported that Arizona doctors reacted with frustration and disbelief after receiving an *RxReview* letter from CVS Caremark promoting the drug Januvia, made by Merck & Co. Inc. "It was just a little irksome the pharmacy is trying to get me to change what I'm doing with my patients," said Dr. Bill Thrift after receiving the *RxReview* letters regarding his patients. "Obviously, it's a sales ploy."[45]

According to G. Caleb Alexander, a University of Chicago associate professor of medicine, Januvia is 5 to 11 times more expensive than other diabetes therapies such as metformin and glipizide.[46]

Thus, while CVS Caremark is a party to many agreements not to switch drugs improperly, the Company's drug-switching practices—and systems that promote drug switching—appear to continue.

# II. Troubling Questions About CVS Caremark's Access To and Use of Private Patient Data

> [A]t CVS, when a consumer or patient comes into our pharmacies, we have a view of that patient's medication record in our pharmacies, in our 6200 stores. With this combination with Caremark ... we'll have a total view of the patient's medication profile wherever they get prescriptions.
> *Thomas Ryan, CVS Caremark Chairman, President, Chief Executive Officer*[47]

CVS Caremark's business model gives the Company unprecedented access to patients' private information. The combined company is now estimated to have access to data on approximately 30 percent of all prescriptions in the country, and plans to use the merger to access and use patient data to take advantage of potential synergies between the companies.[48] These synergies include significant cross-marketing between the two sides of the Company in ways that enable the Company to sell more healthcare and non-healthcare related products, primarily through increased store traffic and customer loyalty for CVS retail stores. For example, the Company is beginning to use patient data for purposes that range from providing CVS discounts, to tracking which patients fail to refill their prescribed medicines, to determining which patients would be most likely to want to purchase over-the-counter products.[49] In fact, the Company boasts about its ability to use all the data it collects to its advantage. As Tom Ryan, Chairman, President and CEO of CVS Caremark stated,

> *"We get the consumer. We have more information on the consumer and their behavior than anybody else, and we share it with our over-the-counter suppliers. We share it with our pharmacy suppliers. So we know how the consumer works."*[50]

This threat to consumer privacy is particularly acute because, as detailed below, the Company—both before and since the merger—has repeatedly been accused of disregarding patient privacy by selling or sharing patient data and improperly handling patients' medical and other private information. In light of this history, CVS Caremark's greatly expanded access to patient data could pose significant new dangers to patients' medical privacy.

## A. Selling Private Personal Data

CVS Caremark does not highlight to its PBM customers that it sells consumer information to drug manufacturers and other third parties. However, these practices are often allowed under its contracts with plans. One typical contract reads:

> Caremark may use, disclose, reproduce or adapt information obtained in connection with this Agreement, including Claims as well as eligibility information, in any matter it deems appropriate, except that Caremark shall maintain the confidentiality of this information to the extent required by applicable Law, and may not use the information in any way prohibited by applicable Law.[51]



BusinessWeek

July 23, 2008

### They Know What's in Your Medicine Cabinet:

How insurance companies dig up applicants' prescriptions – and use them to deny coverage

A July 2008 *Business Week* investigation revealed that health, life, and long-term-care insurance companies are among the purchasers of prescription data from PBMs, including CVS Caremark. Even more troubling, these companies may use this data to deny people coverage or charge them higher premiums based on their prescription drug history.[52]

CVS Caremark and its allies have strenuously opposed state efforts to prevent the sale of private information. In a lawsuit brought by health data company IMS challenging a Vermont law to restrict data-mining by healthcare companies, CVS Caremark executive Scott Tierney testified that his company had sold patient data to IMS and other companies "for a broad range of uses for many years."[53] Mr. Tierney also testified that CVS Caremark desired to continue selling patient information to IMS and others so that they could use the data "for marketing or promotion of prescription drugs."[54]

## B. Using Patient Data to Market for Drug Companies

CVS Caremark also uses patient and physician data to promote drugs on behalf of pharmaceutical companies in ways that may compromise patient privacy. For example, CVS Caremark touts its *RxReview* program as providing "in-depth educational information" on prescription drugs and other treatment options to physicians.[55] However, *RxReview* was a program maintained by AdvancePCS, which was acquired by Caremark in early 2004. According to allegations advanced in a massive false claims suit brought by the federal government against AdvancePCS, the *RxReview* program was actually a series of letters sent to doctors designed to convince them to prescribe drugs for which the company received kickbacks from drug manufacturers and that were actually more expensive for plans. These mailings allegedly included the full names of patients the doctors were treating for various diseases and promoted a specific brand name drug as a possible treatment. The lawsuit further alleged that AdvancePCS did not disclose that it was being paid by drug manufacturers to send the letters. The suit also alleged that in 2001 this program generated an estimated $40 million in revenue for the company, nearly all of which was profit.[56] That this same program was continued by Caremark and now CVS Caremark raises troubling questions about whether the Company has lived up to the promises it made in settling the prior false claims suit.

CVS has also sent promotional letters to patients themselves, purporting to provide objective health-care advice, while actually being paid for the promotions by the drug's manufacturer. In October 2007, a Massachusetts Superior Court judge found CVS had engaged in consumer deception and failed to disclose conflicts of interest when it sent a letter to a CVS customer promoting certain drugs. The judge found that CVS, in including the customer in a mass mailing promoting certain treatment, had deceived him by failing to disclose that the letter was not only funded by a pharmaceutical company, but also that CVS was profiting from the arrangement.[57]

It appears that CVS Caremark continues to send letters promoting specific brand name drugs. A doctor received the letter below in June 2008. CVS Caremark sent the letter to promote Januvia, a diabetes medication manufactured by Merck. The letter was accompanied by several "chart inserts" that identified the doctor's

diabetes patients by name, patient identification number, and date of birth, and suggested that they might be candidates for a Januvia prescription.[58]

## CVS Caremark uses plan members' names and prescription information to market drugs to doctors



The Company has also introduced an electronic prescribing program called *iScribe*. When physicians register for *iScribe*, they give CVS Caremark "the right to sell, transfer and license the Transaction Data, including data that identifies you from your Registration Information, to pharmaceutical manufacturers, healthcare clearinghouses and data analysis companies."[59] They also give CVS Caremark the right to "collect Transaction Data generated by your use of our products," including, among other things, patient name, address, phone number(s), date of birth, gender, and prescription data, and to share this data with third party partners like drug manufacturers.[60]

## C. Information Hungry: Continually Seeking More Personal Data

CVS Caremark's contract with the National Association of Counties (NACo) for a Prescription Drug Discount Card Program illustrates how the Company finds ways to profit from collecting consumer information. The Company advertises the NACo discount card as a no-strings-attached way for consumers, especially the elderly and the uninsured, to get discounts of up to 20% on prescriptions; all one has to do is sign up.[61] However, the contract that counties enter into with CVS Caremark, which consumers don't see, allows the Company to **send marketing materials to participants, accept rebates and payments for promotion services from drug manufacturers and other third parties without disclosing those payments to the county, and to use the patient information it collects through the agreement however it wants.** Under the contract, Caremark also is not required to disclose service fees that drug manufacturers pay to Caremark, and Caremark may retain 100% of any manufacturer rebates.[62] In April 2008, more than 983 counties nationwide were participating in this program.[63]

## D. Failing to Protect Patient Privacy in the Retail Setting

In addition to using patient data for marketing purposes on the PBM side, CVS Caremark also has disregarded patient privacy in the most basic ways: its retail stores have been caught repeatedly dumping unshredded, unaltered patient information into publicly accessible trash containers at its retail stores. In 2007 the Attorneys General of Texas and Indiana both brought suit against CVS Caremark for dumping sensitive customer information in publicly accessible trash bins.[64] The Texas Attorney General brought suit in April 2007 after it determined CVS Caremark had dumped more than 1,000 customers' records—including names, addresses, dates of birth, types of medications, and credit card numbers—into a garbage container outside a CVS store.[65]

Just five months later, in August 2007, the Indiana Attorney General filed similar complaints against CVS Caremark with the Indiana State Board of Pharmacy, alleging improper disposal of patient records that included treatment information and other personal information: "**Pharmacy staff carelessly included private health information with general trash rather than destroy this protected information in a manner designed to properly safeguard patients' privacy.**"[66]

In March 2008, CVS Caremark agreed to settle the Texas complaint by entering into a final judgment that requires CVS Caremark to, among other things, "overhaul" its information security program, train its employees on privacy procedures, and conduct regular inspections of its stores' patient information disposal practices.[67] However, that agreement applies only in Texas, and since then the Company has already been called on by another state's Attorney General to "resolve its practice of not protecting private consumer information."[68]

In June 2008, California Attorney General Jerry Brown called on the Company "to comply with California laws requiring proper storage and disposal [of] consumer's confidential medical and financial information," stating he had reason to believe that CVS pharmacies may not have been properly protecting consumers' confidential data.[69]

As discussed in more detail below, the Company's poor history with regard to patient privacy in its PBM and retail practices, and aggressive and widespread use of patient data to conduct marketing on behalf of drug companies, should make the newly combined company—with its unprecedented access to patient data, and its extensive plans to exploit those data—highly alarming to plans and patients alike.

# III. Secrecy in CVS Caremark's Business Practices Hinders Accountability

The PBM industry is notoriously opaque. Most of the big PBMs earn a substantial part of their profits not from the health plans they contract with, but from a variety of sources that are not understood by or even disclosed to their clients. PBMs started out as prescription claims processing businesses, but today, "revenue from POS [point of sale] claims processing provides little to no margin for PBMs."[70] A large portion of their earnings now comes from rebates, discounts, and fees for other services they receive from drug manufacturers, pharmacies, and other third parties.[71] These hidden revenue sources include:

- Rebates and discounts drug manufactures pay PBMs, typically based on the volume of certain drugs PBMs get plans to purchase

- Other service and administrative fees from drug manufacturers that compensate the PBM for drug promotion activities

- Margins on drugs sold at pharmacies and by mail order

- Other payments from third parties, such as for the sale of consumer data[72]

## INVESTORS BUSINESS DAILY

January 31, 2008

### Pharmacy Benefits Manager's Simple Pricing Wins State Contracts

"... Catalyst Rx—won a five-year contract starting in July to manage programs for 200,000 Maryland state employees. It beat out the longtime incumbent, Caremark, which merged with CVS in March. One major factor the state cited in Catalyst's favor was its transparency..."

CVS Caremark holds itself out to plans as offering a service that saves plans money. When CVS Caremark negotiates contracts with health plans, plans are told that the Company is working for them to get cheaper drug prices. But this may not actually be true given the incentives CVS Caremark may have to favor certain drugs regardless of whether those drugs are the best value for plans or the best for patients.

In addition to receiving payments from drug manufacturers to market specific drugs directly to doctors and patients, CVS Caremark also enters into contracts with drug manufacturers that give the Company rebates on drug prices.[73] Rebates paid by drug manufacturers generally increase as the volume of drugs sold by a PBM like CVS Caremark to its client plans goes up. Moreover, CVS Caremark may earn big rebates on drugs that are not the cheapest for plans or the best for patients. As a result, CVS Caremark may have significant profit incentives that conflict with the interests of plans and their members. As Keith Bruhnsen, the University of Michigan's assistant director of benefits, said after helping switch the University to another PBM: "The drugs that Caremark had negotiated rebates on were not best-value drugs."[74]

Under their contracts with CVS Caremark, plans are generally not entitled to learn the details of CVS Caremark's rebate agreements with manufacturers or the overall amount of rebates CVS Caremark earns from drug manufacturers.[75] Indeed, maintaining this business model depends on intense secrecy surrounding

PBMs' practices, in particular the monies and fees earned from drug companies and actual prices paid by each party to prescription transactions. In a recent decision, the First Circuit Court of Appeals observed:

> The health benefit provider . . . often has no idea that a PBM may not be working in its interest. This lack of awareness is the result of the fact that there is little transparency in a PBM's dealings with manufacturers and pharmacies.[76]

CVS Caremark is enormously resistant to transparency, and has demonstrated greater resistance than other PBMs in some specific instances. It has taken extraordinary measures to prevent greater disclosure of its practices, including, as described below, interfering with audits by its clients, opting out of contract opportunities to avoid greater disclosure, and vigorously opposing legislative and other measures to increase transparency in the PBM industry.

## A. CVS Caremark's Restrictions on Audits May Limit Its Accountability to Plans

Auditing can expose costly errors—or fraud—by PBMs and reap big benefits for plans. Audits completed by the United States Office of Personnel Management in 2006 identified over $13 million in administrative fees collected from the Federal Employees Health Benefits Program's (FEHBP) Retail Pharmacy Drug program between 2000 and 2005 by AdvancePCS—which was acquired by Caremark in early 2004—that should have been considered drug rebates and returned to the FEHBP as the contract specified. These audits also found that AdvancePCS was not in compliance with all provisions of the contract and federal procurement regulations.[77]

**Associated Press**

February 2, 2005

### State Deal With Caremark Under Scrutiny

"The state of Illinois is paying a company more than $250 million this year to fill prescriptions for government workers and retirees. That much is certain.

But how much Caremark Rx Inc. charges for each prescription is a mystery. So are the administrative costs the state pays and the amount that pharmacies get for joining the program."

However, one of the key ways in which CVS Caremark resists transparency is by limiting plans' ability to conduct meaningful audits to ensure they are getting the deal CVS Caremark promised them. While the Company says in its Corporate Social Responsibility Report released in May 2008 that it guarantees "rigorous audit rights" for clients,[78] the contracts that CVS Caremark writes often limit plans' ability to audit its practices in myriad ways. These may include limiting the nature of the audit, requiring the plan to pay for the audit, restricting which documents can be audited, giving CVS Caremark veto power over who can conduct the audit, and requiring such strict confidentiality between the auditor and CVS Caremark that the auditor may not share information gathered in the audit even with the plan that hired it. These restrictions allow CVS Caremark to keep important information from plans, including information about drug pricing and the amount and source of fees and other revenues it receives from drug manufacturers and other companies.[79]

Further, in some instances when plans have attempted to audit CVS Caremark's practices, CVS Caremark has simply stonewalled. For example, the Southeast Pennsylvania Transportation Authority (SEPTA) sued Caremark in 2007 after it attempted, unsuccessfully, to conduct an audit of its plan. SEPTA claimed in its lawsuit that "Caremark has wrongfully blocked SEPTA's efforts to conduct an audit of Caremark's performance as SEPTA's pharmacy benefit manager" and "repeatedly interfered with or otherwise restricted SEPTA's attempt to audit Caremark."[80] Specifically, SEPTA alleges that after it informed Caremark it planned to conduct an audit, Caremark engaged in tactics to delay and block the audit, including first agreeing to provide certain

claims data to SEPTA that were necessary to the audit but then failing
to produce that data, and refusing to sign a tolling agreement to
preserve SEPTA's claims while the audit was pending.[81]

In its lawsuit, SEPTA expressed frustration over Caremark's lack of
transparency in explaining why it felt compelled to sue the
Company, stating:

> *"Having exhausted all efforts to conduct a thorough audit and to
> resolve amicably any and all problems with Caremark's practices,
> SEPTA was forced to bring this action to protect its public assets
> and interest of its members and beneficiaries in controlling the
> costs of prescription drugs."[82]*

Caremark's alleged actions are in stark contrast to the promises
Caremark made to SEPTA when the Company was trying to win
SEPTA's business:

### Pharma MARKET*letter*

November 21, 2005

## US Appeals Court upholds Maine PBM disclosure law; PCMA "will fight on"

A decision by the US First Circuit Court of
Appeals has upheld the state of Maine's
Unfair Prescription Drug Practices Act,
which requires pharmacy benefit
managers to disclose information about
potential conflicts of interest and price
negotiations with drug manufacturers...

> *SEPTA can have complete access to prescriptions, paid claims, tracking of rebates, and other data, as
> necessary... We encourage SEPTA to perform audits of our plan performance, reporting, mail service
> dispensing, and formulary management, in comparison to the guarantees that apply to each side.[83]*

Similarly, in January 2008 Kindred Healthcare sued CVS Caremark, claiming the Company overbilled it by
more than $500,000 and refused to provide the records necessary to investigate the matter. In its complaint,
Kindred alleged that "Caremark delayed in providing information to Kindred, or provided inaccurate
information...Caremark at one point refused to provide information detailing the overpaid claims unless
Kindred agreed that Caremark was not liable for the overpayments."[84] In other words, Caremark wouldn't let
its client plan investigate whether Caremark had overcharged it unless the plan agreed in advance that even
if Caremark had done so, Kindred would take no action to make Caremark remedy the overcharges. CVS
Caremark settled this lawsuit on undisclosed terms in April 2008.[85]

CVS Caremark's refusal to allow clients access to information affecting their plans can have real costs for those
clients. As these examples illustrate, plans' attempts to evaluate the Company's contractual performance can
escalate into full-scale business conflicts and even litigation. Such conflicts take a tremendous toll on plans
simply attempting to provide reliable and affordable prescription benefits to their members.

## B. CVS Caremark Has Lost Business for Protecting Its Secrets

CVS Caremark has lost the business of substantial contracts in part because of its lack of transparency, even
compared to other significant PBMs.

CVS Caremark's resistance to transparency has prompted some plans to abandon the Company. In 2005 the
University of Michigan stopped doing business with Caremark, expressing concerns about lack of
transparency in pricing and the rebates Caremark received from drug manufacturers.[86] Similarly, after being a
Caremark customer for over ten years, in 2007 the State of Maryland selected Catalyst Rx over CVS Caremark
for a $1.1 billion, five-year PBM contract to cover more than 200,000 state employees and their families. CVS

Caremark appealed the state's decision and the Maryland State Board of Contract Appeals reviewed the contract award. After extensive review, Maryland stuck with Catalyst Rx over Caremark, even though CVS Caremark made the lower bid. Transparency was a major factor for the state, and in rejecting Caremark, the state noted that Caremark's "commitment [to transparency] seemed vague—[our evaluation] team [was] not comfortable that they will be able to audit."[87]

In 2005 the State of Illinois ended a $250 million-a-year contract with Caremark two years early and hired Medco because of frustrations about Caremark's lack of transparency. According to Dan Long, Executive Director of the Illinois Commission on Government Forecasting and Accountability, the state chose Medco in part because "Caremark's unwillingness to allow such openness in its contract took it out of the running."[88]

Illinois' concerns about Caremark arose when two state senators requested a copy of the state's contract with Caremark after receiving constituent complaints that Caremark might be overcharging the state. In response to the senators' requests, and plans of the Illinois comptroller's office to release Caremark's contract in response to the request, Caremark sued the state to enjoin the release of its public contract. The *Chicago Tribune* intervened, arguing that public business should be made public. In fact, government officials and public information experts said they could not recall another time when lawmakers had had to go to court for access to a state contract. [89]

"At this point, you have to ask yourself what's the secret?" said Senator Peter Roskam, one of the senators who requested the information.[90] After months of delay and the court battle instigated by Caremark, in the end the judge held "the information at issue is not a trade secret or otherwise protected," and ordered the release of Caremark's contract.[91]

The chart below detailing CVS Caremark's PBM contract language illustrates how restrictive some CVS Caremark contracts are in terms of client access to information.

Transparency-Related Contract Provisions:

## Some CVS Caremark Contracts Fail to Provide Adequate Transparency

| ADMINISTRATIVE FEES | SERVICE FEES |
|---|---|
| "Administrative fees are paid to Caremark by manufacturers for its own account for the work it does in providing an aggregate rebate contracting vehicle for manufacturers. These fees belong exclusively to Caremark."[92] | "Caremark does not disclose to its clients detailed information regarding the service fees received [from drug manufacturers] and does not share those fees with its clients."[93] |

| PURCHASE DISCOUNTS/REBATES |
|---|
| "Purchase discounts that are negotiated by, and belong to, Caremark's mail service and/or specialty pharmacies are bulk purchase discounts…they do not constitute "remuneration" or revenue provided to Caremark by manufacturers."[94] |
| "Caremark may hold contracts with the manufacturers and distributors of products covered under this Agreement. In connection with such contracts, Caremark may have a financial relationship with such manufacturers and distributors and may receive and retain rebates and discounts from such manufacturers and distributors. Caremark negotiates such rebates and discounts on its own behalf as a purchaser of pharmaceutical products over its aggregate book of business and not on behalf of any client or plan. Caremark shall have the exclusive right to enter into contracts with any pharmaceutical manufacturer or distributor with respect to rebates or discounts for the Services provided under this Agreement. Neither Client nor Plan shall have any right to or interest in such rebates or discounts."[95] |

Battles with Caremark over public disclosure continue. In Texas, for example, CVS Caremark has brought at least eleven separate suits seeking to block the release of its contracts covering public employees in Texas, even after the Texas Attorney General issued legal opinions in each instance stating that the Caremark contract at issue should be released as a public document under well-established Texas law.[96][97]

## C. Fighting To Keep PBMs' Secrets On All Fronts

CVS Caremark has also fought legislation that would require more disclosure by PBMs. CVS Caremark is a prominent member of the Pharmaceutical Care Management Association (PCMA), a PBM interest group that lobbies against legislation and other efforts that would help consumers and health plans by requiring increased transparency in the PBM industry. CVS Caremark's Executive Vice President and President of Caremark Pharmacy Services, Howard McLure, is the Board Chairman of PCMA.

The PCMA has vigorously opposed federal and state legislation seeking to increase the transparency of PBMs. For example, in December 2007 the U.S. Department of Labor (DOL) proposed new regulations that would require all service providers to health plans, including PBMs, to disclose all direct and indirect compensation they receive, including their usually-secret agreements with drug manufacturers and pharmacies for rebates and other administrative fees. In February 2008, PCMA sent a letter to the DOL urging it not to include PBMs in the new disclosure requirements:

> The final regulation should exclude from its coverage Pharmacy Benefit Managers (PBMs)... [so that] a PBM is not obligated to disclose specific information regarding its contracts and arrangements with third parties if the information constitutes a trade secret or is not generally known to the public...[98]

In addition, PCMA filed a lawsuit challenging legislation in Maine that would require PBMs to disclose and pass on the rebates and other fees they receive, and to act in their client's best interests.[99] PCMA eventually lost the Maine battle, but only after delaying implementation of this beneficial legislation for several years. PCMA has filed a court challenge to similar legislation that was passed in the District of Columbia. That lawsuit is still pending.[100]

Caremark, in part through the PCMA, was also involved in efforts to oppose PBM rebate and price disclosure requirements in the Medicare Modernization Act of 2003 for plans that participate in Medicare Part D, like CVS Caremark's SilverScript plan.[101] In fact, former Caremark CEO Mac Crawford, who was at the helm during the merger between CVS and Caremark, consulted on the early stages of the legislation and provided vocal support in the media for the new benefit, which is administered by private insurance companies instead of the government. Caremark ultimately won the Medicare fight to squash greater transparency requirements in the Act, and as discussed above, CVS Caremark continues to oppose state-level efforts to increase transparency and require disclosure of rebates and other revenue sharing agreements.

In addition, Caremark and AdvancePCS were among several PBMs that were sued when they allegedly refused to comply with a California law requiring PBMs to provide plans with reports listing the prices paid to pharmacies and by plans for certain drugs.[102] Caremark was dropped from the suit, but AdvancePCS, now a subsidiary of CVS Caremark, continues as a defendant. Once again, PBM opposition has left the law tangled up in the courts for the last two years.

# IV. CVS Caremark: A Bad Deal for Health Plans and Employers?

*If you're a payer for healthcare, you've got to wonder if you're going to be getting as good a deal with CVS [Caremark]... I'd think twice about doing business with them.*
*Richard Frank, Health Care Policy Professor, Harvard Medical School*[103]

**W**hen health plans choose a PBM, their largest concern is often pricing. This is unsurprising given that spending on prescription drugs has increased over 400% between 1990 and 2006, to $216.7 billion, and is predicted to increase to $515.7 billion by 2017.[104] However, even on price, CVS Caremark may be a risky option for plans. An analysis of public documents regarding CVS Caremark's contracts and pricing practices reveals that CVS Caremark can be a bad deal for plans, and that price alone may be ample reason for plans to reject doing business with CVS Caremark.

Some reports indicate that CVS Caremark costs plans significantly more than other PBMs. For example, in an August 2008 report, the Texas State Auditor's Office found that CVS Caremark was a significantly more expensive PBM than Medco, even when serving the same agency. When these costs were broken down by price per member, the Caremark contract cost the Teacher Retirement System $2,048 per member, while Medco charged $663.[105]

## Table 1[106]

**Total Drug Costs Associated with Selected Agency and Higher Education Institution PBM Contracts**[ab] Fiscal Year 2007

| Agency or Higher Education Institution | PBM Contractor | Effective Date of Contract with PBM | Number of Members Covered | Plan Drug Costs (in thousands) | Members' Cost Share for Drugs (in thousands) | Total Drug Cost (in thousands) |
|---|---|---|---|---|---|---|
| Employees Retirement | Medco Health Solutions, Inc. | September 1, 2005 through August 31, | 449, 644 | $334,408 | $162,911 | $497,319 |
| Teacher Retirement System - Medco | Medco Health Solutions, Inc. | September 1, 2002, through August 31, 2008 | 228,899 | 151,820 | 75,668 | 227,488 |
| Teacher Retirement System Caremark | Caremark, LLC[c] | September 1, 2004 through August 31, 2006; annual renewals through August 31, 2010 | 154,780 | 316,996 | 106,603 | 432,599 |
| The University of Texas System | Medco Health Solutions, Inc. | September 1, 2006, through August 31, 2009 | 147,614 | 117,309 | 39,155 | 156,464 |
| The Texas A&M University System | PharmaCare Management Services, Inc.[c] | September 1, 2006 through August 31, 2009; annual renewals through August 31, 2012 | 34,092 | 32,139 | 11,566 | 43,705 |
| | | Totals | 1,015,049 | $952,672 | $395,903 | $1,348,575 |

a-Amounts shown for drug costs do not reflect rebates, refunds, or administrative costs incurred.
b-For amounts in millions, totals may not sum precisely do to rounding.
c-Caremark, LLC and PharmaCare Management Services, Inc. are subsidiaries of CVS Caremark Corporation.

Although issues like plan design and demographics may factor into these cost differences, lack of transparency obscures whether there are legitimate reasons for such significant price differences. The Texas State Auditor's report revealing these contract pricing disparities also urged state agencies to implement contract provisions to ensure the agencies could "clearly understand the true costs and discounts associated with their plans."[107]

In addition, some plans simply pay far more than others under different CVS Caremark contracts, raising questions about the basis for CVS Caremark's contract structure and fee system. For example, some clients pay higher dispensing fees and receive deeper discounts than others. The health plan for Chenango County, New York, pays a $2.25 dispensing fee at retail and receives a 14% discount on Average Wholesale Price (AWP), whereas Caremark recently offered the Genesee County, Michigan health plan a $1.40 dispensing fee and a 17.5% discount (see Table 2).[108] Similarly, CVS Caremark's rebate guarantees vary a great deal among plans; while Kent County, Michigan takes in $17.73 in rebates per mail-order prescription, Albany County, New York receives only $7.60.[109]

**Table 2**[110]

|  | Genesee County, MI | Kent County, MI | San Antonio Water System | Albany County, NY | Chenango County, NY |
|---|---|---|---|---|---|
| Retail AWP Discount | 17.5% | 17% | 15.5% | 14% | 14% |
| Retail Brand Dispensing Fee | $1.40 | $1.50 | $1.70 | $1.95 | $2.25 |
| Mail-Order Rebate per script | $12.01 | $17.73 | $22.98 | $7.60 | $7.15 |

Note: AWP is the benchmark price CVS Caremark uses to charge health plans[111]

Prices are a key area in which CVS Caremark provides little transparency. Plans do not know what other plans pay for CVS Caremark's services, and CVS Caremark goes to great lengths to ensure that these prices remain secret. CVS Caremark attempts to classify its prices as trade secrets and vigorously fights attempts to shed public light on the pricing of even public contracts, leaving clients in the dark about whether they are receiving a fair deal. (Appendix B contains a comparison of the prices contained in the CVS Caremark contracts that were obtainable under state and local public records laws.)

## A. Plans Save Millions After Dropping CVS Caremark

It is not surprising that plans can realize huge savings by dropping CVS Caremark. The Company itself reports that it earns significantly higher profits from its clients in comparison to its biggest competitors. In the fourth quarter of 2007, CVS Caremark made an average of $4.48 on each prescription the Company filled, while Medco made $2.53, and Express Scripts made $2.35.[112]

Many plans have saved millions of dollars by dropping CVS Caremark. In 2006 the State of Illinois decided to end its $200 million-a-year contract with CVS Caremark early and started a new contract with Medco. The state estimates that it will save $120 million over the next five years as a result.[113] Similarly, in 2005 the University of Michigan dropped CVS Caremark, noting poor service and the Company's secrecy around its rebate agreements with drug manufacturers.[114] Since dropping CVS Caremark, Michigan has saved millions with its new PBM, SXC Solutions.[115]

## B. CVS Caremark Has Repeatedly Been Accused of Cheating Plans

Numerous CVS Caremark clients have accused the Company of withholding money that the plans themselves were entitled to or engaging in deceptive or fraudulent practices that ended up costing clients more. For example, in 2006 the United States Office of Personnel Management identified over $13 million in administrative fees collected from the Federal Employees Health Benefits Program's (FEHBP) Retail Pharmacy Drug program between 2000 and 2005 by AdvancePCS—which Caremark acquired in early 2004—that should have been considered drug rebates and returned to the FEHBP as the contract specified. The BlueCross BlueShield Association, the health plan that contracted with the government and AdvancePCS, agreed with these government findings.[116]

In addition to these findings by the federal government, many other CVS Caremark clients have sued the Company or sought to recover money after concluding CVS Caremark deceived or overbilled them. Some of these suits have been massive government suits, settled by the Company for tens or hundreds of millions of dollars. Other suits were brought by smaller plans but with equally egregious allegations. CVS Caremark has settled some of these suits, but many are still pending:



### CVS Caremark Leads in Profits Per Prescription Filled

**CVS Caremark $4.48**

**Medco $2.53**

**Express Scripts $2.35**

*CVS Caremark collects nearly two dollars more in profit per prescription filled than its nearest competitor.*

### Federal and State Government Clients

- Caremark paid $137 million in 2005 to settle a false claims suit brought by the United States government alleging, among other things, that the Company engaged in fraudulent pricing schemes: "Defendant devised elaborate schemes which paid pharmacies at a much lower rate than it in turn billed its customers, including Government Programs. In order to carry out these schemes, Defendant created false claims records to deliberately conceal the spread between its pharmacy reimbursement and what it billed its customers."[117]

- CVS Caremark paid $38.5 million in 2008 to 28 states and the District of Columbia to settle claims alleging a broad range of deceptive business practices, including drug switching and drug promotions to maximize payments from drug manufacturers.[118] According to the complaint filed by the State of Illinois, "Caremark represents to physicians and to Plan Participants that drug switches save Plan Participants and/or the Client Plan money, when that is not necessarily the case. In fact, some drugs to which Plan Participants are switched actually cost more or approximately the same amount as the originally prescribed drug. . . Caremark's drug switching programs are determined largely by Caremark's desire to maximize its receipt of rebates from drug manufacturers."[119] The claims also included allegations that the Company engaged in unfair and/or deceptive practices relating "to Caremark's disclosures to Client Plans, health care providers, prescribers, and Plan Participants related to Caremark's receipt of manufacturer payments."[120]

- In 2008 CVS Caremark agreed to pay almost $37 million to settle claims brought by the federal government, 23 states, and the District of Columbia that the Company defrauded Medicaid by systematically switching Medicaid patients to a different form of an antacid that was up to 400% more expensive than the one originally prescribed.[121]

- A pending false claims suit that was filed in 2005, in which the federal government and the states of Texas, Florida, Arkansas, and Tennessee have intervened, alleges that Caremark cheated the federal government and the states out of millions: "From at least 1996 to the present, Caremark has defrauded the United States and the States of millions of dollars by unlawfully refusing to fully reimburse federal health insurance programs . . . Caremark has knowingly perpetrated several fraudulent schemes that have resulted, and continue to result, in the fraudulent rejection, denial, or underpayment on legitimate requests for reimbursement to federal health programs."[122]

## Local Government Clients

- The Southeast Pennsylvania Transportation Authority (SEPTA) sued Caremark in 2007 for allegedly engaging in illegal self-dealing at the plan's expense: "Caremark was compensated by SEPTA for its services in the form of an administrative fee. . . Caremark, however, obtained other compensation far in excess of those administrative fees by virtue of its self-dealings with pharmacies, drug manufacturers, and other entities. As a direct and proximate result of Caremark's conduct, SEPTA was not only deprived of rebates, interest, and other pricing advantages generated and retained by Caremark, but also paid inflated drug costs, resulting in a waste of taxpayer dollars."[123]

- The Hardin County Commissioners in Texas recently settled a Medicaid dispute with CVS Caremark. The County alleged that the Company failed to reimburse it for out-of-pocket prescription fees paid by participants in the County's indigent care program when CVS Caremark had also received money from Medicaid covering the costs of this program.[124]

## Union and Private Health Plan Clients

- In 2007, the New York State Teamsters Council Health and Hospital Fund settled a case in which it alleged CVS Caremark improperly withheld rebates and fees the Fund was entitled to under its contract.[125]

- Kindred Healthcare Inc. sued CVS Caremark in January 2008 for allegedly overbilling it by more than $500,000.[126] CVS Caremark settled this lawsuit on undisclosed terms in April 2008.[127]

In total, the Company has paid out over $200 million in settlements since 2005. The multiple suits for fraud and similar misconduct brought against the Company since then—by plans including private, union, and state and federal programs and plans—suggest CVS Caremark's business practices continue to raise questions of fraud and abuse.

**thesouthern**

November 19, 2004

### Illinois Ends Caremark Contract

"Illinois' Central Management System plans to terminate a contract with a pharmaceutical services giant (Caremark) early for essentially "suckering" the state..."

# V. Repeated Accusations of Fraud and Service Issues for CVS Caremark

**M**any plans have also had alarming experiences with misconduct by CVS Caremark. The Company's alleged misconduct ranges from simply providing poor service to possible fraud and illegal handling of drugs. Plans that have experienced these problems have faced significant service disruptions, to the point that they have switched PBM providers in the midst of a contract term. Several plans have experienced problems so serious they felt compelled to sue CVS Caremark to enforce their rights and protect their members. In these lawsuits, many of which the Company settled, plans have also alleged an unwillingness or inability by CVS Caremark to address those problems. These allegations include that the Company:

- Put patient health at risk by improperly reselling returned medications and deceiving plans about these practices.

- Engaged in fraud under its contracts or government programs.

- Provided service so deficient that plans switched to other PBMs mid-contract.

As discussed in greater detail below, these accusations of fraud and poor service suggest that Caremark—whether because of greed or simply mismanagement—is often unable to provide quality service to plans and their members.

## A. CVS Caremark Charged With Repackaging, Reselling Returned Drugs

> Caremark's fraudulent practices gave a back seat to patient safety and wellbeing.
> *State of California ex rel. Fowler, Second Amended Complaint*[28]

One of the most egregious practices of which Caremark has been accused is the deliberate mishandling of returned medications, and fraudulent double-billing going along with the mishandling. Several sources have alleged that CVS Caremark instructs employees at its mail order facilities who receive returned drugs in the mail to repackage the returned medications and send them out to new customers.[29] These practices are in direct violation of laws and regulations, designed to protect patient health, that prohibit the repackaging and resale of returned medications.

### KHOU-TV (CBS)

April 4, 2007

#### Caremark Investigation

It is the biggest drug corporation of its kind, but are Caremark's practices putting millions of U.S. consumers in danger?

In February 2008 CVS Caremark agreed to pay $38.5 million to 28 states and the District of Columbia to settle lawsuits including allegations regarding restocking and reselling returned drugs. As a part of the settlement CVS Caremark promised to refrain from restocking

and re-shipping returned drugs where this is prohibited by law.[130]

Another case containing even more detailed accounts of these allegations is still pending in the courts. According to a 2005 lawsuit filed against CVS Caremark by internal whistleblowers:

> [D]espite the fact that these returned prescription drug products normally had been shipped out . . . in 'cold packs' or other temperature sensitive packaging, Caremark regularly received these returned drugs, re-stocked them, and re-sold them to other unsuspecting Caremark customers.[131]

## Business Insurance News & Analysis

December 10, 2007

### Retailer Battles Rival Over Rx Payment Rate: Fight Pits Walgreens Against CVS-Owned PBM

A reimbursement dispute between Walgreens Co. and CVS Caremark Corp. is the first major skirmish between a pharmacy benefit manager and a retailer since the CVS Caremark merger, but it is likely not the last, observers say.

Caremark allegedly did not test these drugs for safety and quality—only "eyeballing" them—before repackaging and reshipping them, even though "they could not ascertain the handling and storage conditions of those prescription drugs from the time they first left" Caremark's facilities and when they were sent back.[132] Remarkably, Caremark allegedly even resold refrigerated drugs, despite their having sat in a warehouse for long stretches after being returned. Moreover, CVS Caremark employees allegedly often used hot blow dryers on the packages of returned drugs to remove the original patient labels from the packages.[133]

A Houston news program aired similar allegations about Caremark. In addition to referencing the pending whistleblower suit, the news program interviewed a former Caremark employee who confirmed that supervisors instructed employees to use hot blow dryers to remove labels from returned drugs, including drugs that required refrigeration.[134]

The same former employee also stated that Caremark also instructed employees to enter restocked drugs into the computer as having been destroyed,[135] a charge the pending lawsuit also makes. The lawsuit alleges that the Company created fraudulent records indicating that returned drugs had been destroyed so it could bill its clients twice for the same drugs. Thus, allegedly "Caremark sold the same prescription drugs *twice* and was compensated for both transactions."[136] According to the suit, these activities were done "in accordance with Caremark's established corporate policies, practices, and procedures, and with the full knowledge and approval of Caremark's management and corporate representatives."[137] The lawsuit continues:

> In short, it was in Caremark's best financial interest *not* to destroy these potentially dangerous returned prescription drugs and instead to re-sell them to unsuspecting plan members . . . Caremark chose revenues and profit taking over the health and welfare of its plan members.[138]