## B. CVS Caremark Customers Complain of Poor Service and Other Questionable Practices

Multiple plans have also claimed more basic problems with CVS Caremark: service issues so serious that the plans have felt compelled to sue CVS Caremark and seek a new provider in the midst of a contract term. Some of these suits have also involved allegations of more questionable practices, and the plans that have sued CVS Caremark have also accused the Company of overbilling or other improper practices. Moreover, the plans experiencing these problems report extreme frustration at what they characterize as the Company's unwillingness or inability to respond to and remedy plans' and members' service issues, and even the Company's obstruction of attempts to address these problems.

Several recent lawsuits by CVS Caremark clients illustrate the service problems plans report experiencing with the Company. For example, in February 2005, Caremark won a contract to provide PBM services to the New York State Teamsters Council Health and Hospital Fund. According to a lawsuit the Fund filed against CVS Caremark in 2006, by the fall of 2005, only months into the contract term, CVS Caremark's service to the Fund was plagued by major flaws—problems that CVS Caremark allegedly acknowledged.[139] According to the suit, these problems included, "**making changes to the schedule of benefits without notifying the participants and their dependents, mishandling prescriptions, thereby resulting in members having prescriptions returned to them, and making significant pricing errors.**"[140] The Fund maintains that Caremark failed to remedy these problems over several months, forcing the Fund to replace CVS Caremark with Medco. Even more disturbing, after the Fund switched PBMs, the Fund says CVS Caremark retaliated by withholding rebates and credits to which the Fund was entitled.[141] CVS Caremark eventually settled the lawsuit for undisclosed terms.[142]

Kindred Healthcare also terminated its contract with CVS Caremark after alleged service problems that it claimed were caused or exacerbated by Caremark's frequent mergers, and that extended to overbilling by CVS Caremark. Kindred stated in its suit that it contracted with Caremark in 2000, and that in early 2007 it terminated its contract because of poor service and systematic overbilling during the term of the contract.[143]

Kindred claimed that the general level of service at Caremark was poor because of Caremark's frequent mergers: "**Caremark experienced several mergers and/or other corporate restructurings while conducting business with Kindred. Not surprisingly, there was a lot of turnover at Caremark, which negatively impacted the service that Kindred received.**"[144] Even more troubling, Kindred also alleged that Caremark overbilled the plan by providing service to employees who were no longer eligible.[145] Kindred claimed the overbilling occurred in spite of the fact that it regularly provided Caremark with updated lists of eligible participants. Further, it says when it raised the overbilling issue, Caremark simply stonewalled or engaged in other obstruction tactics, at one point even refusing to cooperate to resolve the issues unless Kindred "agreed that Caremark was not liable for the overpayments."[146] After terminating the contract in 2007, Kindred finally sued the Company in January 2008 for breach of contract, breach of fiduciary duty, and negligent misrepresentation, claiming more than half a million dollars in damages. CVS Caremark settled this lawsuit in April 2008 on undisclosed terms.[147]

A May 2008 lawsuit by an individual plan member against CVS Caremark made similar claims about poor service, alleging the Company repeatedly "lost prescriptions," "failed to fill prescriptions," was "untimely filling prescriptions," or "lost documents necessary to process claims."[148] That suit is still pending.[149]

The Company's own customer satisfaction surveys have found dissatisfaction with service. Here are just some examples pulled from dozens of customer complaints recorded during Caremark's 2007 surveys of Florida state plan participants:[150]

*"Took too long to get my medication."*[151]

*"The lateness of receiving my prescription."*[152]

*"They couldn't tell me where my prescription was. They don't have any tracking numbers on their mail and they told me that I would have to pay to track it."*[153]

*"Caremark and people were not talking to each other. Neither company was doing quality control for data entry. Data entry was done wrong twice."*[154]

*[Why problem was not resolved on first call:] "The person was unknowledgeable and uninterested."*[155]

*[How Caremark can improve:] "Being better at customer service and the ability that a pharmacist can answer questions."*[156]

*"When there is a problem, they would rather patch up the problem than help fix the problem …"*[157]

# VI. The CVS-Caremark Merger: Expanding the Risks for Plans and Patients

*[This merger] might be very good for CVS, but it's hard to imagine how it is good for the public. There is no evidence this kind of thing passes money onto patients.*
*Sidney Wolfe, MD, Director, Public Citizen Health Research Group[158]*

**W**ith the completion of the merger between CVS and Caremark, the Company became the largest provider of prescriptions in the United States, filling or managing more than 1.2 billion prescriptions annually. CVS Caremark also has more retail drugstores (6,300), more retail health clinics (over 500), more active cardholders in its retail loyalty program (over 50 million), and more pharmacists and nurse practitioners than any company in the nation.[159] The combined drugstore-PBM giant has relationships with over 150 million consumers, one of every two Americans, and has access to data on approximately 30 percent of all prescriptions in the United States.[160] CVS Caremark's mammoth size and scope give it an unmatched ability to influence consumers, health plans, doctors, and drug manufacturers, and to compile unprecedented levels of personal information about its customers. As the Company boasts, its "new integrated model ... allows us to offer services to our consumers and clients that no one else in America can offer."[161]

The CVS-Caremark merger has the potential to create a host of problems for the plans and patients the Company serves. As explained in more detail below, some of the risks presented by the merger include:

- Service problems, including disruptions caused by increased conflict between CVS Caremark and retail pharmacies that compete with CVS.

- Increased costs for plans, because the Company's business model now depends on **increasing** sales of prescriptions.

- Potential risks to patient health caused by conflicts of interest between the PBM and retail side of the business, as the Company attempts to entice consumers into its retail stores to purchase items—such as cigarettes, alcohol, and junk food—that undermine health care goals.

- Increased incentives—and massively expanded opportunities—for the Company to engage in drug switching.

- Increased dangers to patient privacy because of the Company's unprecedented access to patients' personal information and new programs already announced to use expanded access to patient information for new forms of health and non-health related marketing programs.

## A. The Merger Could Increase Service Problems for Plans and Members

Because of the merger, CVS Caremark now has every incentive to push its PBM members to fill their prescriptions in CVS stores instead of other retail pharmacies. This causes conflicts with other pharmacies and service problems for Caremark plan members. For example, according to Walgreens, just months after the CVS-Caremark merger, CVS Caremark reduced reimbursement rates for Walgreens pharmacies in the Midwest

for certain employer-sponsored plans. In response, Walgreens threatened to stop filling prescriptions for Caremark members and CVS Caremark in turn sued Walgreens.[162] On November 29, 2007, after the lawsuit went into arbitration, Walgreens announced it was withdrawing from the CVS Caremark network with respect to four healthcare plans that use CVS Caremark—including the Wisconsin Education Association Trust, which covers more than 100,000 employees in Wisconsin—and would no longer fill these plan members' prescriptions.[163]

Commentators predict that such disputes will continue:

> "A reimbursement dispute between Walgreens Co. and CVS Caremark Corp. is the first major skirmish between a pharmacy benefit manager and a retailer since the CVS Caremark merger, but it is likely not the last, observers say. **Plan sponsors need to prepare for further disputes and closely monitor their PBMs' pricing activities**, formulate plans to notify employees of any prescription drug plan changes and evaluate the ability of employees to access other pharmacies, they say."[164]

Moreover, according to several of the Company's former customers, including Kindred Healthcare and the University of Michigan, past Caremark mergers have led to major service disruptions. This merger may well lead to the same types of problems, especially given that Caremark is attempting to integrate its operations with the country's largest retail pharmacy chain.

The merger also raises questions about the Company's ability to integrate information systems. Caremark has not integrated the multiple different IT systems of PBMs it acquired in the last decade. As a result, the Company currently operates at least three separate IT platforms on the PBM side of its business, one for each of its legacy PBM companies (Caremark, Advance, and PCS). CVS Caremark executives say they currently have no plans to integrate the multiple systems into one platform.[165]

## B. The Merger Creates New Conflicts of Interest within CVS Caremark

Caremark itself seems to recognize that operating as part of a retail-PBM combination creates conflicts of interest and the specter of "hidden agendas." Prior to the CVS-Caremark merger, Caremark claimed to be an independent PBM: "Our independence from pharmaceutical and other industry-related parent companies ensures our clients that we have no hidden agendas, and that we act *solely* in the best interest of our clients and their plan participants."[166] Even after the merger, CVS Caremark continues to recognize the importance of appearing independent. In February 2008, nearly a year after the merger, Caremark wrote in a proposal to a potential PBM client: "our independent status, with no relation to a manufacturer *or a retailer*, gives you additional economic and quality benefits as we make drug/clinical decisions with objectivity and provide unbiased access to participants."[167]

As the Company's own statements suggest, combining Caremark and CVS puts together two businesses that have inherent conflicts of interest. Caremark, as a PBM, is expected to sell patients the fewest and cheapest drugs and save plans money, and certainly not sell plan members unhealthy items like junk food or cigarettes. In fact, before this merger the Company claimed to focus on lowering plans' prescription costs and saving plans money.[168] But CVS Caremark's retail operation succeeds by selling more drugs, and does not have the same incentive to save plans money. As Keith Bruhnsen, Assistant Benefits Director at the University of Michigan, observed: employers who contract with CVS Caremark **"should be nervous and need to ask some questions. They're going to have to examine whether this is going to create some conflicts of interest."**[169]

Indeed, the combined company has already announced new programs that focus on selling more prescription drugs. In a recent presentation, a CVS Caremark executive used this slide to illustrate how the Company will maximize opportunities to sell patients additional drugs.



As the slide suggests, Caremark has introduced a new program called *Proactive Pharmacy Care*, under which Caremark will enlist CVS pharmacists to use "face-to-face" contact with customers to ensure that patients on maintenance medications keep up with their refills.[171] Under the new program, CVS pharmacists will automatically refill a prescription before a patient asks for it, and patients will receive automated phone calls or emails encouraging them to come pick up their refill.[172] This program will enable the Company to sell more pills by getting patients and their plans to pay for refills the patient might otherwise have foregone.



## C. The Merger and Its Focus on Retail Selling Pose Risks for Patient Health

The Company's new business model depends on using customer information to drive its PBM customers into CVS stores to sell them other products.[174]



The Company has initiated a number of programs to get Caremark patients to shop at CVS, including:

- Adherence Outreach: "Outreach calls from the pharmacy to encourage patients who have stopped their drug therapy to restart therapy."

- IVR Refill: "Automated call reminders to patients to refill upcoming prescriptions."

- Maintenance Choice: Described as a "cost saving initiative" that allows patients to get the same reduced prices available at mail order at retail stores— the only catch is that patients must go to a CVS store to take advantage of these savings.[175]

- ExtraCare Health card: Touted as a special offering that gives CVS Caremark customers discounts at CVS stores, and that will give them the "opportunity to earn special offers and discounts tailored to their health care needs," the card appears to be simply a vehicle for targeted marketing to get patients to spend more at CVS retail stores.[176]

While these cross-promotional activities may increase the Company's sales by boosting retail traffic and purchases, they also create potential threats to patient health. Specifically, many of CVS's most profitable products are unhealthy items like junk food, cigarettes, and alcohol, so a retail sales push by the Company could actually undermine patients' health and harm plans' bottom lines as a result.[177] As Sean Brandle, National Pharmacy Practice Leader at Segal Consultants puts it: **"This is a good way for CVS to funnel Caremark members into their stores and sell them chips and soda when they go to fetch their prescriptions."**[178]

This concern is not merely theoretical: even CVS Caremark's CEO has acknowledged that the profitable nature of cigarette sales has so far overcome the Company's concerns for patient health, saying: "It is a conflict. We have a vision in our company to strive to improve human life and it is a challenge around cigarettes. It's a big number from a dollar standpoint" and, he said, is something the Company has wrestled with internally.[179]

Pushing customers to fill their prescriptions in CVS stores comes with another potential cost to patient health, at least according to Caremark's pre-merger statements. Prior to the merger, Caremark's website cautioned its

patients about the risks of filling prescriptions at retail pharmacies, saying the pressure on retail pharmacists to fill hundreds of prescriptions each day leads to dangerous errors and insufficient patient counseling.[182] Yet now that the Company includes a retail pharmacy chain and earns more when patients fill prescriptions in CVS stores, its tune has changed: The Company now claims that filling prescriptions at retail is *positive* for patient health because of the opportunity for face-to-face interactions with pharmacists, and encourages patients to fill their prescriptions at CVS retail pharmacies.[183]

## D. The Merger Creates More Opportunities for Improper Drug Switching

As explained above, the Company has already entered into a number of consent orders to settle government charges of improper drug switching. These charges included that Caremark engaged in extensive marketing in exchange for drug manufacturer payments to encourage doctors to prescribe specific brand name drugs, drugs that Caremark claimed would save plans money, but that in fact only provided greater kickback payments to Caremark.[184] They also included charges that CVS routinely switched Medicaid patients' prescriptions for an antacid to a much more expensive form of the same drug in order to overbill Medicaid by as much as 400%.[185]

Now, the combination of a PBM and retail chain may give CVS Caremark greater ability to engage in drug switching, including improper drug switching. As the Company puts it, "We have invested heavily in an infrastructure that influences physician, patient, and pharmacist."[186] Moreover, the Company now has a greater incentive to switch drugs because it gets paid at both the



### Open Access from CVS Caremark: Optimizing All Delivery Channels

Mail Pricing, Retail Convenience and Counseling

Our new Maintenance Choice program — widely available in 2009 — will bring mail pricing to CVS/pharmacy retail stores for many clients. Plan participants will have the convenience of using either mail service or their local CVS/pharmacy store where they can pick up their maintenance medications. They will also enjoy same day prescription availability and the opportunity to talk with the pharmacist face to face.

retail and PBM levels when a CVS pharmacist dispenses a drug to a Caremark PBM client, giving the company more opportunities to arrange lucrative rebates and discounts from drug manufacturers. Thus, the merger of Caremark and CVS has put together a PBM with the ability and incentive to garner large payments from drug companies for favoring certain drugs, with a retail business that has an army of retail employees it can direct to deliver on these incentives.

## E. The Merger Greatly Exacerbates Privacy Concerns

The combination of Caremark and CVS may pose special new problems for consumers because of the Company's ability to track consumers' health care and non-health care buying habits and exploit this information to sell more products. CVS Caremark's CEO described the Company's unique power due to the merger this way:

> We get the consumer. We have more information on the consumer and their behavior than anybody else, and we share it with our over-the-counter suppliers. We share it with our pharmacy suppliers. So we know how the consumer works.[187]

Remarkably, **1 in 2 people in the United States now receives prescription or health services from CVS Caremark**, and the Company has access to data on approximately 25 percent of all prescriptions in the United

States, over 1.2 billion prescriptions.[188] Thus, the merger has given the Company unprecedented access to consumers' private prescription information.

Many of the new initiatives CVS Caremark has announced since the merger, or is expected to announce soon, rely on increased use of patient data for marketing purposes.[189] Indeed, the Company has announced its intention to focus on utilizing patient data to influence behavior and drive profits.[190] Mac Crawford, the head of Caremark during the merger, summed it up when he said:

> I think, when you take and looked [sic] at the information that CVS has and what they know about their consumers and their customers, and combine it with what we know about ours, it is going to be a very, very powerful analytical platform, with information that was difficult for us to get access to.[191]



Similarly, Jack Bruner, CVS Caremark's Executive Vice President of Strategic Development and Marketing, touted the Company's increased ability to change consumer behavior because of its access to customer information:

> Soon our single view of each customer will allow us to be the first PBM to personalize interactions and anticipate individual needs...We're going to have more and better at [bats], or opportunities, to interact with consumers in terms of changing behaviors. Marketing and consumer experts would all agree, when you look at those metrics that drive the financials and the success of the business, reinforcement of key messages is central to behavioral change. Because there are ten pharmacy interactions at retail for every mail interaction, and because of the other channels that we have, we have more opportunities to use the information that we have about consumers...[192]

CVS Caremark's increased use of patient data poses new risks to patient privacy. The Company plans to contact patients without permission to offer unsolicited health care products and discounts, call Caremark patients at home to tell them they should refill their prescriptions, and send marketing materials to doctors referring by name to specific patients and their medical conditions, among other new initiatives. Here is another possibility laid out by David Rickard, CVS Caremark EVP, CFO, and Chief Administrative Officer:

> We think one of the possibilities there is the sale of OTC [over the counter] products with pharmacy mail-order. We have CVS.com. We do this today. But the scale of operation at Caremark is such that introducing that to that operation might be highly profitable. And if you think about common chronic disease states, very often there are OTC products that are helpful in addressing those same things. They may get the prescription for diabetes, but there may be eye care or foot care products that they should consider. And what if we were in the position when the order came in to call up and say, you know what, often people with your disease states need these OTC things. We have them available at these reasonable prices, would you like us to throw them in the bag?[193]

What may be even more troubling is that **thousands of CVS Caremark employees will have regular access to patients' data in order to carry out these initiatives,** and by increasing the use and cross-use of patient data,

the Company increases the risk that confidential patient data will be exposed unintentionally. This is especially true given the Company's history of failing to safeguard patient data, as discussed above.

**Finally, the Company will use its access to information about retail and PBM customers to tie drugstore purchasing habits to medication records.** The existing CVS customer loyalty program, ExtraCare, is the largest customer loyalty program in the United States, with 50 million members. The Company already uses the program to collect data on customers' individual shopping habits, and to tailor marketing to them. The combined Company plans to automatically enroll 10 million CVS Caremark PBM customers in the program and send unsolicited membership cards to their homes.[194] Adding these new members will allow the Company to track the spending habits of millions more Americans and try to influence their behavior through targeted marketing.

Indeed, the Company has already announced plans to use enrollment in the ExtraCare health card to market supposedly health-related products, available at CVS retail stores, to new Caremark member-enrollees. The marketing is to be **specifically tailored to that members' medical situation, based on data Caremark has on that patient.**

According to a Company statement, "CVS Caremark members will receive a special ExtraCare Health card offering an additional 20% discount on FSA-eligible CVS branded items and the opportunity to earn special offers and discounts tailored to their health care needs."[195] As CVS Caremark executive Helena Foulkes promises, the Company "will be adding more robust client specific targeting capabilities **that directly tie with our focus on improving outcomes.**"[196] For example, according to Foulkes, the Company will use Caremark's patient-specific data to mail disease-specific promotions to customers, including customers who may never have shopped at CVS before, and will use Caremark patient data to target Caremark members with over-the-counter conversion offers—such as $5 CVS brand Zyrtec. These initiatives represent new, possibly unwelcome invasions of personal medical privacy for plan members and, because of the dramatically increased use of their data, new dangers that patients' medical privacy will be compromised.

> <u>What CVS Caremark plans for consumers in 2009</u>: Imagine you are a Caremark PBM customer who prefers to fill your prescriptions at your local Walgreens, and you value your privacy and do what it takes to safeguard your personal information. Unbeknownst to you, your employer signed a contract with CVS Caremark that allows them to use your personal information to increase sales at CVS retail stores and sell your sensitive data to third parties. In the near term, expect a call from the pharmacist at your local CVS, where you have never been, calling you by name and reading off the prescription drugs you are currently taking. Then a couple of days later you may get a mailing from CVS Caremark with CVS coupons and an ExtraCare card offering you discounts if you go to your local CVS. The coupons are for products targeted at you, because of course they have demographic information about you, too. And if you decide to start using your ExtraCare card at your local CVS to buy over-the-counter medications and occasional snacks, you can bet that insurance companies will probably know about these purchases along with your prescription drug history, and will use this information to decide whether to give you insurance coverage and what rates to charge you, because CVS Caremark may sell them your private data.[197]

# Recommendations

CVS Caremark provides PBM services to over 4,000 organizations and fills or manages over 1.2 billion prescriptions annually. As the preceding sections demonstrate, plans need to be better armed in their interactions with this powerful company in order to prevent themselves from being defrauded and overcharged, and to protect their members' privacy and health.

There are three main steps PBM clients should take to protect themselves from the problems discussed above that CVS Caremark clients have encountered. First, plans should be very careful in drafting their PBM contracts to ensure that they can track how each and every dollar they pay their PBM is spent. Second, plans should regularly audit their PBM's performance to make sure they are receiving the deal they were promised in the bid process. Finally, plans should take an active role in improving the PBM industry by being involved in legislative efforts that would address common problems in a systematic way.

## KNOW YOUR PBM CONTRACT

Plans should closely oversee their PBM contract from the request for proposals through negotiation, implementation, and monitoring. Plans should pay particular attention to several areas of concern:

**Request for Proposals:** CVS Caremark and other PBMs may make unsubstantiated promises about large cost savings to win contracts. It is essential that plans require competing PBMs to "agree to specified prices and specified contract terms, in writing, in a binding, executed contract, before a PBM 'finalist' is selected."[198] Otherwise plans may have no recourse when promised savings do not materialize. In addition, plans that use PBM consultants to choose their PBM should require their consultant to sign a conflict of interest disclosure form promising that they are not receiving payments from PBMs seeking the plan's business.[199] Furthermore, plans should never enter or extend a PBM contract without doing a request for proposals. Despite the extra hassle, it is in plans' financial best interest to let companies compete for their business.

**Contract Terms:** Plans should be wary of contract terms that could harm the plan and its members, such as:

- PBM retention of rebates and other payments from drug companies;
- Authorizing the PBM to use and sell the personal information of plan members;
- Allowing the PBM to switch drugs without guaranteeing the switch will result in lower costs for the plan;
- Limiting the plan's access to information; and
- Restricting the plan's auditing rights.

In an audit report examining the PBM contracts of several public entities, the Texas State Auditor found that "the use of contract provisions developed by PBM contractors increases the risk that [plans] may unintentionally agree to unreasonable contract requirements."[200]

**Drug Switching:** In order to ensure that drug switches are carried out in the financial and healthcare interest of your plan and members, plans should consider requiring their PBM to implement only drug switches that save the plan and/or plan members money and that have no negative health consequences for members, and requiring their PBM to provide reports verifying that these are the only types of switches occurring.[201]

**Use of Personal Data:** In light of CVS Caremark's post-merger initiatives that depend on increased utilization of personal information for marketing purposes, careful delineation and oversight of PBM access to personal data is particularly important. Plans should find out if and how their PBM is financially benefiting from the use of plan members' data.

**Auditing Rights:** Some CVS Caremark clients have complained that the Company has denied them access to information necessary to fulfill their fiduciary duty to audit PBM services. Without access to information about the PBM's relationships with drug manufacturers, pharmacies, and other third parties, "it is not clear whether the payments that [plans] make to PBM contractors are reasonable or excessive with respect to the costs and discounts PBM contractors have agreed upon with drug manufacturers, drug wholesalers, and pharmacies."[202] Thus, plans should demand that their contracts give them full rights to audit how their PBM is spending their money.

**Transparency:** Plans should ask their PBM to provide a list of third parties making payments to the PBM and how much they are paying so that they can know what possible conflicts of interest to watch out for.

## AUDIT YOUR PBM'S PERFORMANCE

Plans have saved or recovered millions of dollars by auditing their PBM's performance, and plans—especially large plans with sizable contracts—should consider conducting regular audits to ensure that they aren't being taken advantage of. Of course, PBMs may try to thwart audits by including restrictive language in their contracts, so before plans try to audit they should find out what their contract allows and, if necessary, demand changes to the contract.

## PBM LEGISLATIVE REFORM

PBMs operate in a weak regulatory environment at both the state and federal levels. For example, though CVS Caremark presents itself as a healthcare company, it is not subject to the same rigorous legal standards health insurance companies must comply with, which require protection of plans' fiduciary duties and plan members' health. Legislative reform is vital to ensuring that CVS Caremark does business honestly and with the best interests of plans and plan members as their top priority.

Key initiatives to support:

1. Transparency legislation requiring disclosure of all payments from drug companies and other third parties to PBMs.

2. Legislation protecting patient privacy by banning PBMs from selling or sharing data for marketing purposes with retail pharmacies, insurance companies, and other third parties.

3. Legislation making PBMs fiduciaries to the plans they serve.

4. Legislation requiring all PBM drug switching to result in lower costs for plans and the plan member and that the PBM obtain permission from both the prescribing physician and the patient for the switch.

Several states, including Vermont, Maine, and Maryland, have passed laws regulating PBMs.[203] Find out whether your state is considering legislation to hold PBMs more accountable to their clients. Visit the National Legislative Association on Prescription Drugs website for more information: www.reducedrugprices.org

Contact us to learn more about more specific things your plan can do to protect itself and how you can be involved in our legislative reform effort.

Email us at **info@alarmedaboutcvscaremark.org**. Also, go to our website **www.AlarmedAboutCVSCaremark.org** for the most up-to-date information on what is happening with this initiative.

(888) 790-0849

# Appendix A: How PBMs Work

Pharmacy benefit managers (PBMs) are middlemen that employers and health insurers hire to administer their prescription drug benefit programs.[204] Most PBMs also earn substantial—if not the bulk of their—profits from drug manufacturers in the form of drug rebates, sometimes paid in exchange for steering patients toward certain drugs, and sometimes for drugs that are not the most affordable for plans.[205] PBMs manage prescriptions for roughly 95% of Americans with prescription drug coverage. The PBM market is dominated by three companies—Medco, CVS Caremark, and Express Scripts—which manage drug benefits for over 230 million Americans.

### Standard Contract Between Health Plans and PBMs

Each contract between health plans and PBMs is different, but most contracts with the three major PBMs have these basic components:

- **Claims processing:** Client plans pay administrative fees to the PBM for services the PBM provides, such as claim processing. These are usually flat fees the PBM charges for each prescription processed or member provided a service. As a part of the agreement, PBMs also often promise plans that they will achieve certain performance goals, including customer service guarantees and cost management pledges.[206]

- **Pharmacy networks:** PBMs create a pharmacy network for client plans that dictates where plan members can pick up their prescriptions. To be included in the network, pharmacies must agree on reimbursement rates with PBMs.[207]

- **Formularies and drug choices:** PBMs create and manage a list of covered prescription drugs—called a formulary or preferred drug list—for the client plan. Drug companies sometimes pay PBMs to include their drugs on the formulary and to take other actions to promote their drugs, such as sending letters to doctors and patients about a drug or, in CVS Caremark's case, sending pharmacists to meet with doctors and try to convince them to favor certain drugs. PBMs may or may not share the revenues from or even disclose these payments—called rebates, manufacturer administrative fees, or manufacturer service fees—with the client plan.[208]

Thus, PBMs have complex contracts with plans, drug manufacturers, and pharmacies. Through this network of contracts, PBMs wield considerable power in the prescription drug industry, influencing what plans and patients pay for drugs and even which drugs they buy.[209]

Because of their market power, PBMs are posting record profits even as many other industries have squeezed out middlemen in the name of efficiency. Medco, CVS Caremark, and Express Scripts had combined total company revenues of almost $140 billion and profits of over $4 billion in 2007. Troublingly, PBMs earn most of these profits in two ways that their client plans and the public know little about.

First, PBMs often profit on the spread between the price they charge client plans for drugs and the price at which they reimburse pharmacies for distributing those drugs to patients.[210] That is, the amount the PBM charges the plan for a pharmacy dispensing a drug can be far higher than the amount the PBM actually pays the pharmacy.[211]

Second, PBMs profit handsomely from the revenues they receive for working in tandem with drug manufacturers.[212] While many people are aware of the great lengths to which large drug companies like Merck, Eli Lilly, and Pfizer go to market their prescription drugs with expensive television ad campaigns, extravagant gifts for doctors, and more, most people are unaware of the integral role PBMs play in this process. In fact, drug companies sometimes pay PBMs to promote their products quietly through activities that may appear to be just educational materials or client services.[213] However, the true aim of these activities can be to influence doctor and patient behavior and thereby increase the sales of the drug manufacturers that fund these programs.[214]

Thus, while PBMs now play a vital role in U.S. health care, they suffer from a basic conflict of interest: they garner business by promising to save health plans money on prescription drugs, but their profits may depend on arranging lucrative deals with drug manufacturers based on the volume of particular brand-name drugs they are able to get plans to purchase and the extent of promotional activities they conduct on a specific drug's behalf.

In other words, although PBMs promise their clients the lowest possible prices and lowest overall drug benefit costs, they may profit by selling specific brand-name drugs—not necessarily the least expensive drugs—whose manufacturers they have agreements with. Indeed, PBMs' claims processing work generally earns them little or no profit; a large portion of some PBMs' profits come from rebates and fees from drug companies and other third parties.[215]

This conflict of interest is compounded by PBMs' efforts to prevent plans from learning the amounts they earn from drug manufacturers and pay to pharmacies. The industry's lack of transparency permits PBMs to exploit their conflicts of interest without accountability to their client plans. Despite many PBMs' efforts to avoid accountability, however, lawsuits alleging fraud, illegal kickbacks, and poor service have plagued the PBM industry for the last decade, forcing the big three companies to pay out hundreds of millions of dollars to settle cases. As David Balto, a former policy director of the Federal Trade Commission put it: **The PBMs cannot avoid a simple truth…No other market is faced by the landslide of lawsuits…attacking the long history of fraudulent and deceptive practices of PBMs…The PBM market is unhealthy and needs a legislative fix. In more than a decade as an antitrust enforcer at the FTC and the Justice Department I found few markets with as significant competitive and deceptive problems.[216]**

# PBM Relationships with Market Participants



PBM

**Health Plan**

Administrative services
Discounts/rebates
Clinical management

Payment for drugs
Administrative fees

**Enrollee**

Mail-order drugs

Mail-order drug cost share

**Retail Pharmacy**

Payment for retail drugs
Clinical information

Electronic claims
Discounted retail drug prices

**Pharmaceutical Manufacturer**

Payment for mail-order drugs
Clinical programs/data

Rebates/fees
Discounted mail-order drugs

Notes: Other market interactions occur that are not represented, including information exchanges among PBMs, manufacturers, wholesalers, physicians, health plans, and enrollees.

Source: Chart adapted from: U.S. Government Accountability Office (fka General Accounting Office). Federal Employees' Health Benefits: Effects of Using Pharmacy Benefit Managers on Health Plans, Enrollees, and Pharmacies. Report to the Honorable Byron L. Dorgan, U.S. Senate. GAO-03-196. January 2003: at p. 12, available at <http://www.gao.gov/new.items/d03196.pdf>.

# Appendix B: CVS Caremark Pricing

| Health Plan Sponsor | Health Action Council of Northeast Ohio | Employers Health Purchasing Corporation of Ohio | KS State Employees Health Care Commission | Montgomery County Public Schools | Houston Independent School District | Philadelphia, PA | City of Austin, TX |
|---|---|---|---|---|---|---|---|
| Covered Lives | 1,500,000 | 500,000 | 87,670 | 40,000 | 29,000 | 28,117* | 17,431 |
| **Retail Rx:** | | | | | | | |
| Brand - | | | | | | | |
| Ingredient Cost (AWP Discount) | 26.5% | 16% | 22.5% | 16% | 21.8% | 16.5% | 20.20% |
| Dispensing Fee | $1.50 | $1.65 | $1.50 | $1.65 | $1.75 | $1.50 | $1.50 |
| Generic - | | | | | | | |
| Ingredient Cost (AWP Discount) | 57.5% | MAC [1] | 62% | 52% | 50% | MAC | MAC |
| Dispensing Fee | $1.50 | $1.85 | $1.50 | $1.65 | $1.75 | $1.50 | $1.75 |
| **Mail Rx:** | | | | | | | |
| Brand - | | | | | | | |
| Ingredient Cost (AWP Discount) | 34.4% | 24% | 32.6% | 24% | 28.0% | 24% | 26.80% |
| Dispensing Fee | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Generic - | | | | | | | |
| Ingredient Cost (AWP Discount) | 59.5% | 60% | 63% | 58% | 55% | 57% | MAC |
| Dispensing Fee | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| **Specialty Rx:** | | | | | | | |
| Ingredient Cost (AWP Discount) | 16% | 17% | | 16% | 15.25% | N/A | 15% |
| Dispensing Fee | $0.00 | $0.00 | | $1.65 | $1.75 | N/A | $1.50 |
| **Rebates:** | | | | | | | |
| Per Script - | | | | | | | |
| Retail | N/A | $3.92 | N/A | $2.85 | N/A | $3.67 | N/A |
| Mail | N/A | $12.19 | N/A | $10.00 | N/A | $14.19 | N/A |
| Reinvestment / Pass Thru Into Pricing | Y | | Y | | Y | | Y |
| **Administrative Fees:** | | | | | | | |
| Participating Pharmacy Claim | | $0.00 | $0.95 | $0.00 | $0.00 | $0.00 | $0.00 |
| Mail Service Claim | | $0.00 | $0.95 | $0.00 | $0.00 | $0.00 | $0.00 |
| Specialty Claim | | $0.00 | | $0.00 | | $0.00 | |
| Paper Claim | | $0.00 | | $1.25 | $2.00 | $1.50 | $0.00 |
| Prior Authorization | $20.00 | $35.00 | | $40.00 | | $40.00 | $0.00 |

Each column represents a contract between Caremark and the health plan sponsor, except, as noted, for the three Genessee County entries, which represent bids from Caremark and three separate partner entities.

Note: Contract terms cited in this table are representative of the respective contracts; some contracts include alternatives and/or exceptions to certain terms. Some contracts include multiple pricing options; in such cases, this table reflects the option that provides plans with the largest discounts (i.e. the option that would cost the least). When contracts provide different fees for Level 1 and Level 2 prior authorizations, this table reflects Level 2 fees; Caremark generally appears not to charge fees for Level 1 authorizations.

| | Onondaga County, NY | Phoenix, AZ | Albany County, NY | Genesee County, MI - ABS/Caremark Bid | Genesee County, MI - AEPC/Caremark Bid | Genesee County, MI - VPS/Caremark Bid | Kent County, MI | Bethlehem Area School District, PA | San Antonio Water System | Columbia, MO | Boone County, MO | Chenango County, NY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 15991 | 14,149 | 6964 | 4149 | 4149 | 4149 | 1973 | 2148* | 1575* | 1242* | 666 | 600* |
| | 15.7% | 16.0% | 14% | 16.0% | 17.5% | 17.0% | 17.0% | 16.5% | 15.5% | 15.5% | 14% | 14.0% |
| | $1.85 | $1.80 | $1.95 | $1.60 | $1.40 | $1.50 | $1.50 | $1.70 | $1.70 | $1.95 | $2.20 | $2.25 |
| | 15.7% or MAC | MAC | RIGHTMAC 2 | 16% or MAC | 64% Effective Rate Guarantee 3 | 61% Effective Rate Guarantee | 17% or MAC | 16.5% or MAC | 15.5% or MAC | 52% or MAC | 14% or MAC | 14% or MAC |
| | $1.95 | $1.80 | $1.95 | $1.60 | $1.40 | $1.50 | $1.50 | $1.70 | $1.70 | $1.95 | $2.20 | $2.25 |
| | 23% | 23% | 20% | 24% | 25.9% | 24% | 25.25% | 24% | 22% | 22% | 19% | 19% |
| | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 55% | 55% | RIGHTMAC | OT PROVIDE | 64.5% Effective Rate Guarantee | 63% | 64% | 57% | 22% or MAC | 55% | 45% | 50% |
| | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| | 15.7% | 16.0% | 15% | 16.0% | 17.0% | 17.0% | 17.0% | 16.5% | 15.5% | 15.5% | 15% | 14.0% |
| | $1.85 | $1.80 | $2.50 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $1.70 | $1.95 | $0.00 | $2.25 |
| | $2.64 | $4.30 | $3.00 | $2.87 | $4.12 | $3.50 | $3.92 | $7.25 (brand only) | $8.00 (brand only) | $3.95 (brand only) | $3.34 | $3.00 (brand only) |
| | $7.91 | $11.45 | $7.60 | $11.85 | $12.01 | $15.00 | $17.73 | $17.00 (brand only) | $22.98 (brand only) | $11.30 (brand only) | $9.78 | $7.15 (brand only) |
| | $0.00 | $0.15 | | $0.10 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.45 | $0.49 |
| | $0.00 | $0.00 | | $0.10 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $0.00 | $0.00 |
| | | | | | | | $0.00 | $0.00 | $0.00 | | | |
| | $1.50 | $1.50 | | $1.50 | $1.50 | $1.50 | $1.50 | $1.50 | | | | $1.50 |
| | $30.00 | $0.00 | | $30.00 | $40.00 | $30.00 | | $30.00 | | $30.00 | $30.00 | $30.00 |

1. MAC drug price lists are proprietary pricing lists developed by PBMs and other entities for generic drugs. See e.g.: Prescription Benefit Management Agreement between Caremark and Employers Health Purchasing Corporation of Ohio: at p. 1.("Maximum Allowable Cost' or 'MAC' means the unit price that has been established by Caremark for a qualifying generic drug on the Caremark MAC list, which may be amended from time to time by Caremark."); Kaiser Family Foundation. *Follow The Pill*: at p 18 (stating "Maximum Allowable Cost (MAC): MAC lists are designed to cap reimbursement for certain generic and multi-source brand products. States and private payers with MAC programs typically publish lists of selected generic and multi-source brand drugs along with the maximum price at which the program will reimburse for those drugs. In general, pharmacies will receive payment no higher than the MAC price when billing for drugs on a MAC list.").

2. *RIGHTMAC is a proprietary pricing MAC list developed by the PBM for generic drugs. See EHS Services. "Proposal for County of Albany: Pricing Summary." 1 Oct. 2004: at p 1 ("We propose a prescription drug pricing structure based on Average Wholesale Price 'AWP' (as published by Medi-Span and updated weekly) and our RIGHTMAC (Maximum Allowable Cost) index.").*

3. *"Effective Rate Guarantee" refers to the combined MAC and non-MAC pricing for generics. Proposal for PBM Services for Genesee County, MI from Caremark and AFL-CIO Employer Purchasing Coalition. 7 Feb. 2008: at p. 2.*

# Endnotes

1. *Prescription Drug Trends.* Kaiser Family Foundation. Sept. 2008: at p. 1, available at <http://www.kff.org/rxdrugs/upload/3057_07.pdf >.

2. Barbara Martinez. "As Health Middlemen Thrive, Employers Try to Tame Them." *The Wall Street Journal.* 29 Dec. 2006: at p. A1.

3. *Transcript of CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting.* 21 May 2008, available through Thomson StreetEvents. ("*CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript*") (Statement of Jon Roberts): at p. 36.

4. As explained in more detail below, CVS Caremark is the merger of CVS, the country's largest chain of retail pharmacies, and Caremark, the country's second-largest PBM. This report refers to actions by and against both companies individually prior the merger in March 2007, as well as to activities of and actions against the merged entity. When discussing a specific action or event, this report specifies which entity – e.g., CVS, or Caremark. or CVS Caremark – was involved in the event. For series of events spanning both pre-merger and post-merger periods of time, this report generally refers to CVS Caremark.

5. CVS Caremark Corporation. Slide Presentation. *The Power of One.* 21 May 2008 ("*CVS Caremark Power of One Slide Presentation*"): at slide 21, available at <http://library.corporate-ir.net/library/99/995/99533/items/294969/2008CVSCaremarkInvestorRelationsALL.pdf>.

6. *Id.* at slide 34.

7. *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript.* (Statement of Helena Foulkes, CVS Caremark SVP of Health Services): at p. 18.

8. Drury, Susan. "Drug Pushing: Why the FBI, the SEC and every other agency you can think of are investigating a Nashville-based Fortune 500 company." *Nashville Scene.* 15 June 2006.

9. CVS Corporation. *Form 425 filed with the U.S. Securities and Exchange Comm'n.* 2 Nov. 2006. (Statement of Mac Crawford, Conference Call Transcript): at pp. 10-11; see also: *CVS Caremark Corporation 2007 Q4 Conference Call Transcript.* 31 Jan. 2008 (Statement of Thomas Ryan, CVS Caremark Chairman, President, CEO): at p. 4, available at <http://seekingalpha.com/article/62548-cvs-caremark-corporation-q4-2007-earnings-call-transcript?page=-1>; *CVS Caremark Power of One Slide Presentation.* at slide 197.

10. The total amount Caremark agreed to pay under this agreement was $41 million: $22 million "to the states for use to benefit low-income, disabled or elderly consumers of prescription medications, to promote lower drug costs for state residents, or to educate consumers concerning the cost difference among medications;" $16.5 million to the states for investigative costs, fees, and consumer education; and $2.5 million set aside by Caremark to reimburse patients who submit claim forms for expenses related to certain drug-switches. Office of the Illinois Attorney General, *Press Release.* "Madigan, 28 Attorneys General Reach Settlement with Caremark for Drug Switching Practices." 14 Feb. 2008, available at <http://www.illinoisattorneygeneral.gov/pressroom/2008_02/2008021 4.html>. Each of the states and D.C. that settled with CVS Caremark filed a complaint and consent order on or around February 14, 2008. These complaints and consent orders are substantially similar. See, e.g., *Illinois v. Caremark Rx. L.L.C.,* No. 08-CH-05634, Circuit Court of Cook County, IL, 14 Feb. 2008 (Complaint for Injunctive and Other Relief); *State of Ohio v. Caremark Rx. L.L.C.,* No. 08CVH02-2251, Court of Common Pleas, Franklin County, OH. 14 Feb 2008 (Complaint for Declaratory Judgment, Injunctive Relief and Costs): at ¶¶ 20-24.

11. *United States ex rel. Lisitza v. CVS Caremark.* 31 Jan. 2003 (Complaint): at p. 1; see also: Won Tesoriero, Heather, and David Armstrong. "CVS Caremark Reaches Settlement." *The Wall Street Journal.* 9 Mar. 2008; CVS Caremark. *Press Release,* "CVS Caremark Issues Statement on Settlement Concerning Retail Dispensing Practices for Ranitidine." 18 Mar. 2008, available at <http://www.cvscaremark.com/newsroom/press-releases/cvs-caremark-issues-statement-settlement-concerning-retail-dispensing-practi>.

12. *United States ex rel. Brown v. CaremarkPCS, Inc.,* No. 02-9236, E.D. Pa., 31 Mar. 2005 (Second Amended Complaint ("SAC")): at ¶¶ 13-19, 23-26; see also: *Medical News Today,* "PBM Caremark Agrees to Pay $137.5M to Settle Kickback Charges." 12 Sept. 2005, available at <http://www.medicalnewstoday.com/articles/30504.php>; Freudenheim, Milt. "Caremark to Settle Whistle-Blower Suit," *The New York Times.* 9 Sep. 2005.. .

13. *United States ex rel. Brown,* SAC: at ¶¶ 16, 24-26; see also: *Id.* at ¶¶ 20. 22, 35.

14. *Illinois v. Caremark Rx, L.L.C.,* Complaint: at ¶¶ 20-23; *State of Ohio v. Caremark Rx, L.L.C.,* Complaint: at ¶¶ 20-24.

15. *United States ex rel. Brown,* SAC: at ¶¶ 24-26.

16. "Plan Scope and Overview" prepared by AdvancePCS, filed as Exhibit 1 to Exhibit 1 of Plaintiff's Discovery Dispute Memorandum, 2 Apr. 2008, in *Southeastern Pennsylvania Transportation Authority v. CaremarkPCS Health L.P.,* No. 07-2919 (E.D. Pa.) ("Plan Scope and Overview prepared by AdvancePCS for SEPTA"): at p. 10; *Bid proposal by CVS Caremark to Employees Retirement System of Texas,* Section X, Interrogatories. 2007: at pp. 89-90.

17. Genesee County, Michigan. *Proposal for Pharmacy Benefit Management and Specialty Pharmacy Management Services for Genesee County,* submitted by Valued Pharmacy Services (VPS) and CVS Caremark. 7 Feb. 2007: at p. 55; see also: example RxReview letter: CVS Caremark. *RxReview: New Trends in Prescription Therapies, Benefits & Costs.* Letter mailed by CVS Caremark to Arizona Physician.

18. Genesee County, Michigan. *Proposal for Pharmacy Benefit Management and Specialty Pharmacy Management Services for Genesee County,* submitted by Valued Pharmacy Services (VPS) and CVS Caremark. 7 Feb. 2007: at p. 55.

19. Genesee County, Michigan. *Proposal for Pharmacy Benefit Management and Specialty Pharmacy Management Services for Genesee County,* submitted by Valued Pharmacy Services (VPS) and CVS Caremark. 7 Feb. 2007: at p. 66; see also: Golden Gate Bridge Highway and Transportation District, California. Amended and Restated *Prescription Benefit Services Agreement with Caremark.* 1 July 2006: at p. 9; Health Action Council of Northeast Ohio, Ohio. *Prescription Benefit Services Agreement with Caremark.* 1 Jan. 2006: at p. 10; Local Government Center HealthTrust, New Hampshire. *Prescription Benefit Services Agreement with Caremark.* 16 Feb. 2007: at p. 14; Michigan State University, Michigan. *Managed Prescription Drug Program – Participating Group Agreement with Caremark.* 1 Feb. 2007: at p. 29; and Montgomery County Public Schools, Maryland. *Prescription Benefit Services Agreement with Caremark.* 1 Jan. 2005: at p. 8.

20. See, e.g., *State of Ohio v. Caremark Rx, L.L.C.* (Complaint): at pp. 5-6; *United States ex rel. Brown,* SAC: at p. 11.

21. Corporate Integrity Agreement between the Office of the Inspector General of the Department of Health and Human Services and CVS Caremark Corporation. 2 Sept. 2005 ("Caremark Corporate Integrity Agreement"); *United States of America v. AdvancePCS,* Nos. 02-CV-9236 & 03-CV-5425 (E.D. Pa.) 8 Sept. 2005 (Consent Order of Court for Injunctive and Settlement). Caremark agreed to be bound by the Corporate Integrity Agreement to the same extent as AdvancePCS.

22. Caremark Corporate Integrity Agreement: at p. 10-16; *United States of America v. AdvancePCS.,* Nos. 02-CV-9236 & 03-CV-5425, Consent Order: at pp. 7-8, 10-26.

23. *State of Washington v. Caremark Rx, LLC,* No. 08-2-06098-5SEA, WA Sup. Ct., King Co. 14 Feb. 2008 (Consent Decree).

24. Won Tesoriero, Heather, and David Armstrong. "CVS Caremark Reaches Settlement;" *United States ex rel. Lisitza,* Settlement Agreement: at p. 5.

25. *United States of America v. AdvancePCS,* Consent Order: at pp. 14-18 & 24.

26. "Caremark Investigation Part 1 – It is the biggest drug corporation of its kind, but are Caremark's practices putting millions of U.S. consumers in danger?" *11 News Defenders*. Reporter Jeremy Rogalski. CBS 11 News, KHOU Houston. 4 Apr. 2007: available at <http://www.khou.com/video/news-index.html?nvid=133313>.

27. *Id.*

28. *Id.*

29. Accordant – A Caremark Company. *Caremark Prescription Service*. Verbatim Comments. *State of Florida, Quarter 1 and 2, 2007: Plan Participant Satisfaction Study*. at p. 00098.

30. *Id.* at p. 00122.

31. *Id.* at p. 00268.

32. *Id.* at p. 00255.

33. *Id.* at p. 00103.

34. *Id.* at p. 00269.

35. *State of California ex rel. Fowler v. Caremark Rx, Inc.*, No. BC307240, Cal. Sup. Ct., L.A. Co. 18 Apr. 2005 (Second Amended Complaint ("SAC")): at ¶ 166.

36. i *Id.* at ¶¶ 195-197.

37. *Southeastern Pennsylvania Transportation Authority v. CaremarkPCS Health L.P.*, No. 07-2919 (E.D. Pa.) (First Amended Complaint ("Amended Complaint")): at p. 5.

38. *Caremark: Provider Manual*. at p. 20, filed as Exhibit 3 in support of Plaintiff's Verified Complaint for Injunctive Relief in *CaremarkPCS Health, L.P. v. Walgreen Co.*, No. 07-C-06272, N.D. IL. 6 Nov. 2007.

39. *Id.* at p. 22.

40. "Caremark Investigation Part 1." *11 News Defenders*.

41. *State of California ex rel. Fowler*. SAC: at ¶ 160.

42. Plan Scope and Overview prepared by AdvancePCS for SEPTA: at p. 10.

43. *Bid Proposal by CVS Caremark to Employees Retirement System of Texas*, Section X, Interrogatories. 2007: at p. 90.

44. Genesee County, Michigan. *Proposal for Pharmacy Benefit Management and Specialty Pharmacy Management Services for Genesee County*, submitted by Valued Pharmacy Services (VPS) and CVS Caremark. 7 Feb. 2007: at p. 55.

45. Gonzales, Angela. *CVS Caremark uses patient inform to market drugs*." *Phoenix Business Journal*. 18 Aug. 2008.

46. "Researchers: Cost of Diabetes Care on the Rise: Newer Drugs are More Expensive." *The Boston Globe*. 28 Oct. 2008.

47. CVS Corporation. Form 425 filed with SEC. 2 Nov. 2006 (Conference Call Transcript): at p. 6.

48. *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript* (Statement of Nancy Christal, CVS Caremark, Director of Investor Relations): at p. 4. see also: *CVS Caremark Corporation 2007 Q4 Conference Call Transcript*. 31 Jan. 2008 (Statement of Thomas Ryan): at p. 4; CVS Caremark Corporation. "Joint Key Messages," *Form 425 filed with the U.S. Securities and Exchange Comm'n*. 2 Nov. 2006: at p. 4; CVS Corporation. *Form 425 filed with the U.S. Securities and Exchange Comm'n*. 2 Nov. 2006 (Statement of Mac Crawford): at p. 10-11; *Conference Call Transcript: CVS Corporation at Morgan Stanley Global Consumer & Retail Conference*, 15 Nov. 2006, filed with SEC 16 Nov. 2006 (statement of Dave Rickard): at pp. 7-8.

49. *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript* (Statement of Helena Foulkes, CVS Caremark Senior VP of Health Services): at p. 16; CVS Caremark. *Press Release*. "CVS Caremark to Present Insights on Redefining the Consumer Health Care Experience at AHIP Institute 2008." 19 Jun. 2008, available at http://www.cvscaremark.com/newsroom/press-releases/cvs-caremark-present-insights-redefining-consumer-health-care-experience-ahi; *Conference Call Transcript: CVS Corporation at Morgan Stanley Global Consumer & Retail Conference*, 15 Nov. 2006, filed with SEC 16 Nov. 2006 (statement of Dave Rickard): at pp. 6-7.

50. *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript* (Statement of Thomas Ryan): at p. 7.

51. Montgomery County Public Schools, Maryland. *Prescription Benefit Services Agreement with Caremark*. 1 Jan. 2005: at p. 8; see also: Golden Gate Bridge Highway and Transportation District, California. *Amended and Restated Prescription Benefit Services Agreement with Caremark*. 1 July 2006: at p. 9. Local Government Center HealthTrust, New Hampshire. *Prescription Benefit Services Agreement with Caremark*. 16 Feb. 2007: at pp. 13-14,

52. Terhune, Chad. "They Know What's in Your Medicine Cabinet: How insurance companies dig up applicants' prescriptions – and use them to deny coverage." *BusinessWeek*. 23 July 2008.

53. *IMS Health Inc. v. State of Vermont*. No. 2:07-cv-188-wks (D. Vt.), Declaration of CVS Caremark Corporation, filed 29 Aug. 2007: at p. 2, ¶ 7.

54. *Id.* at p. 3, ¶ 10.

55. Genesee County, Michigan. *Proposal for Pharmacy Benefit Management and Specialty Pharmacy Management Services for Genesee County*, submitted by Valued Pharmacy Services (VPS) and CVS Caremark. 7 Feb. 2007: at p. 55.

56. *United States ex rel. Brown*, SAC: at ¶¶ 31-40.

57. *Kelley v. CVS Pharmacy, Inc., et al.*, No. 98-0987-BLS2, Suffolk Superior Court, Mass.. Mem. Of Decision and Order, 22 Aug. 2007: at p. 8; see also: Frank, David E. "Customer is entitled to damages after CVS adds name to mailing: Letter fails to disclose financial arrangement with drug company." *Massachusetts Lawyers Weekly*. 15 Oct. 2007.

58. CVS Caremark. *RxReview: New Trends in Prescription Therapies, Benefits & Costs*. Letter mailed by CVS Caremark to Arizona Physician.

59. CVS Caremark. "Customer Support: Privacy Policy." iScribe: Physician Services from CVS Caremark: available at <http://www.iscribe.com/customerSupport/privacyPolicy.html> (website last reviewed Sept. 8, 2008).

60. *Id.*

61. CVS Caremark. "Welcome National Association of Counties: How it Works." CVS Caremark: available at <http://www2.caremark.com/naco/> (website last reviewed Sept. 2, 2008).

62. DeKalb County, Georgia. *AdvancePCS Health, L.P. Managed Pharmacy Benefit Services Agreement Consumer Card Program*. 28 Mar. 2006: at pp. 2-4.

63. National Association of Counties (NACo). *Press Release*. "Consumers save more than $83 million nationwide with NACo's Prescription Drug Discount Card Program." Apr. 2008: available at <http://www.naco.org/Template.cfm?Section=County_Membership&template=/ContentManagement/ContentDisplay.cfm&ContentID=27189>.

64. Office of the Indiana Attorney General. "Attorney General Files Charges against Pharmacies and Pharmacists for Leaving Personal Prescription Information Unguarded." *Press Release*. 20 Sept. 2007: available at <http://www.in.gov/attorneygeneral/press/Release.Pharmacycharges.html>; see also: *In the Matter of the Indiana License of: CVS Pharmacy #4982 Before the Indiana State Board of Pharmacy*, Cause Number 2007 IBP 0042, Complaint, filed 31 Aug. 2007 (one of ten similar complaints filed against ten different CVS stores by Indiana Attorney General); *State of Texas v. CVS Pharmacy, Inc.*, No. CV-72881 (D. Ct. Liberty Co., 253rd Jud. Dt.), Plaintiff's Original Petition and Application for Injunction, filed April 17, 2008: available at <http://www.oag.state.tx.us/newspubs/releases/2007/041607cvs_pop.pdf>; Office of the Texas Attorney General. "Attorney General Abbott Continues Aggressively Enforcing Identity Theft Prevention Law: CVS Pharmacy cited for exposing hundreds of customer records." *Press Release*. 17 Apr. 2007: available at: <http://www.oag.state.tx.us/oagNews/release.php?print=1&id=1976>.

65. *State of Texas v. CVS Pharmacy, Inc.*. Petition: at pp. 4-5; Office of the Texas Attorney General. "Attorney General Abbott Continues Aggressively Enforcing Identity Theft Prevention Law: CVS Pharmacy cited for exposing hundreds of customer records." 26 Mar. 2008: available at <http://www.oag.state.tx.us/oagNews/release.php?print=1&id-2397>.

66. *In the Matter of the Indiana License of: CVS Pharmacy #4982*, Complaint: at p. 1.

67. *State of Texas v. CVS Pharmacy, Inc.*, Agreed Final Judgment and Permanent Injunction, filed 25 Mar. 2008; available at <http://www.oag.state.tx.us/newspubs/releases/2008/032608cvs_afj.pdf>; see also: Office of the Texas Attorney General. "Attorney General Abbott Reaches Agreement To Protect Pharmacy Customers From Identity Theft: Agreed judgment requires CVS Pharmacy to improve document disposal process."

68. Earnest, Leslie. "CVS told to pull expired products." *Los Angeles Times.* 20 June 2008.

69. *Id.*; see also: Office of Texas Attorney General. Press Release. "Attorney General Abbott Reaches Agreement To Protect Pharmacy Customers From Identity Theft."

70. Martin, Steven S. "PBM Industry Today: Who's Managing Drug Costs?" *Managed Care Magazine.* Dec. 2001; available at /www.managedcaremag.com/archives/0112/0112.pbmfuture.html>.

71. *Id.*; see also: U.S. Government Accountability Office (fka General Accounting Office). *Federal Employees' Health Benefits: Effects of Using Pharmacy Benefit Managers on Health Plans, Enrollees, and Pharmacies.* Report to the Honorable Byron L. Dorgan, U.S. Senate. GAO-03-196. January 2003: at pp. 25-28; available at <http://www.gao.gov/new.items/d03196.pdf>.

72. *Proposal for PBM Services for Genesee County, MI from Automated Benefit Services and Caremark.* 7 Feb. 2008: at p. 78; see also: Kaiser Family Foundation. *Follow The Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain.* Prepared by The Health Strategies Consultancy LLC. Mar. 2005: at pp. 14 and 17; available at <http://www.kff.org/rxdrugs/7296.cfm>; *Proposal for County of Albany from EHS Services/PharmaCare.* 1 Oct. 2004: at p. 8; Martinez, Barbara. "Selling generic drugs by mail is lucrative business." *The Wall Street Journal.* 9 May 2006; Gans, Robert I. and Bartholomew E. Clark. "The Spread: Pilot Study of an Undocumented Source of Pharmacy Benefit Manager Revenue." *Journal of the American Pharmacists Association.* 44(1), 2004: at p. 16; Prime Therapeutics. "Prime Therapeutics Supports CMS Proposal to Limit Spread Pricing in Medicare Part D Administration." *Press Release.* 28 Jul. 2008: available at <http://www.reuters.com/article/press Release/idUS130285+28-Jul-2008+PRN20080728>; IMS Health Inc. Declaration of CVS Caremark Corporation: at ¶¶ 5-10; Terhune, Chad. "They Know What's in Your Medicine Cabinet."

73. *Proposal for PBM Services for Genesee County, MI, submitted by Automated Benefit Services and Caremark.* 7 Feb. 2008: at p. 78; *Proposal for County of Albany, submitted by EHS Services/PharmaCare.* 1 Oct. 2004: p. 8; Montgomery County Public Schools, Maryland. *Prescription Benefit Services Agreement with Caremark.* 1 Jan. 2005: at p. 11.

74. Wessel, David, Bernard Wysocki Jr., and Barbara Martinez. "As Health Middlemen Thrive, Employers Try to Tame Them."

75. See, e.g., Golden Gate Bridge Highway and Transportation District, California. *Amended and Restated Prescription Benefit Services Agreement with Caremark.* 1 July 2006: at p. 9 (Client "acknowledges that it shall not be entitled to audit… agreements with vendors, pharmaceutical manufacturers, or distributors, participating pharmacies or other providers of products or services to Caremark."); Health Action Council of Northeast Ohio, Ohio. *Prescription Benefit Services Agreement with Caremark.* 1 Jan. 2006: at p. 10; Local Government Center HealthTrust, New Hampshire. *Prescription Benefit Services Agreement with Caremark.* 16 Feb. 2007: at p. 14; Montgomery County Public Schools, Maryland. *Prescription Benefit Services Agreement with Caremark.* 1 Jan. 2005: at p. 11. In addition, many Caremark contracts further contain language similar to the following: "Caremark may hold contracts with the manufacturers and distributors of products covered under this Agreement. In connection with such contracts, Caremark may have a financial relationship with such manufacturers and distributors and may receive and retain rebates and discounts from such manufacturers and distributors. … Neither Client nor Plan shall have any right or interest in such rebates or discounts." See Golden Gate Bridge Highway and Transportation District, California. *Amended and Restated Prescription Benefit Services Agreement with Caremark.* 1 July 2006: at p. 12.

76. *Pharm. Care Mgm't Ass'n v. Rowe*, 429 F.3d 294, 298 (1st Cir. 2005) (affirming district court order granting Maine Attorney General's motion for summary judgment and dismissing case). The associated district court case is *Pharm. Care Mgmt. Ass'n v. Rowe*, No. 03-153-B-H (D. Me.).

77. Unites States Office of Personnel Management, Office of the Inspector General. *Final Audit Report: Report on the Audit of AdvancePCS.* Office of Audits. Report No. 1H-01-00-04-100. Washington. 30 Mar. 2006: at p. 4; Unites States Office of Personnel Management, Office of the Inspector General. *Final Audit Report: Report on the Audit of AdvancePCS.* Office of Audits. Report No. 1H-01-00-06-063. Washington. 7 Sep. 2006: at Executive Summary and p. 4.

78. CVS Caremark. *2007 Corporate Social Responsibility Report.* May 2008: at p. 31, available at <http://media.corporate-ir.net/media_files/irol/99/99533/CVS_Caremark_CSR.pdf>; see also: CVS Caremark. "CVS Caremark Releases Company's First Corporate Social Responsibility Report." *Press Release.* 6 May 2008: available at <http://phx.corporate-ir.net/phoenix.zhtml?c=99533&p=irol-newsArticle&ID=1139962&highlight>.

79. See, e.g., Golden Gate Bridge Highway and Transportation District, California. *Amended and Restated Prescription Benefit Services Agreement with Caremark.* 1 July 2006: at p. 9; Health Action Council of Northeast Ohio, Ohio. *Prescription Benefit Services Agreement with Caremark.* 1 Jan. 2006: at p. 10; Local Government Center HealthTrust, New Hampshire. *Prescription Benefit Services Agreement with Caremark.* 16 Feb. 2007: at p. 14; Michigan State University, Michigan. *Managed Prescription Drug Program – Participating Group Agreement with Caremark.* 1 Feb. 2007: at p. 29; Montgomery County Public Schools, Maryland. *Prescription Benefit Services Agreement with Caremark.* 1 Jan. 2005: at p. 8.

80. *SEPTA v. CaremarkPCS Health L.P.*, Amended Complaint: at pp. 5, 8.

81. *Id.* at ¶ 21.

82. *Id.* at ¶ 22.

83. Plan Scope and Overview prepared by AdvancePCS for SEPTA: at p. 42.

84. *Kindred Healthcare Inc. v. CVS Caremark Corp.*, No. 08CV-120-S, W.D. KY, Complaint (filed as Exhibit 1 to Notice of Removal, 22 Feb. 2008): at p. 5.

85. *Kindred Healthcare Inc.*, Agreed Order Dismissing Action With Prejudice, filed 18 Apr. 2008.

86. Wessel, David, Bernard Wysocki Jr., and Barbara Martinez. "As Health Middlemen Thrive, Employers Try to Tame Them."

87. Maryland State Board of Contract Appeals. *Opinion by Chairman Burns in the Appeals of Caremark Under DBM Solicitation No. F10R6200071.* Mar. 2007: at p. 21, available at <http://www.msbca.state.md.us/decisions/2007/pdf/caremarkpcs.pdf>.

88. Drury, Susan. "Drug Pushing."

89. Associated Press. "State Deal With Caremark Under Scrutiny." *CBS2Chicago.com.* 2 Feb. 2006: available at <http://cbs2chicago.com/politics/caremark.governor.cotract.2.316693.html>; see also: Massingale, Mary. "Judge rules Caremark contract should be public." *Copley News Service.* 4 Feb. 2005; Long, Ray. "Mail-order pharmacy takes state fight to court." *Chicago Tribune.* 21 Jan. 2005, North Shore Final Edition: at p. 1.

90. Associated Press. "State Deal With Caremark Under Scrutiny."

91. Massingale, Mary. "Judge rules Caremark contract should be public."

92. Genesee County, Michigan. *Proposal for Pharmacy Benefit Management and Specialty Pharmacy Management Services for Genesee County, submitted by Valued Pharmacy Services (VPS) and CVS Caremark.* 7 Feb. 2007: p. 66.

93. *Id.*

94. *Id.*

95. Montgomery County Public Schools, Maryland. *Prescription Benefit Services Agreement with Caremark.* 1 Jan. 2005: at p. 11.

96. The only exception to this is the AG opinion issued with respect to a request for the Caremark contract with the Texas Teachers' Retirement System, in which the Attorney General stated that because the availability of certain Caremark materials, including some contract materials, was already the subject of ongoing litigation, the Attorney General would refrain from ruling on the availability of those specific materials. Texas Attorney General, *OR2007-16246.* 10 Dec 2007: at p. 2.

97. *Id.* The eleven Texas Attorney General Open Records Decisions are OR2007-14751 (9 Nov 2007); OR2007-15005 (14 Nov 2007); OR2007-15122 (16 Nov 2007); OR2007-15814 (30 Nov 2007); OR2007-16246 (10 Dec 2007); OR2008-08944 (02 Jul 2008), OR2008-11771 (26 Aug. 2008); OR2006-10313 (Sept. 5, 2006); OR2006-05573 (26 May 2006); OR2006-04561 (4 May 2006); OR2006-04017 (20 Apr. 2006).

98. Levy, Barbara A. "Re: Comment Letter on Proposed Regulations: Reasonable Contract or Arrangement Under Section 408(b)(2) – Fee Disclosure." *Pharmaceutical Care Management Association (PCMA).* Via e-mail to e-ORI@dol.gov. 11 Feb. 2008 (in Executive Summary).

99. *IMS Health Inc.,* No. 2:07-cv-188-wks (D. Vt.).

100. Sipkoff, Martin, "State laws requiring PBM transparency see some gains, some losses," *Drug Topics.* 11 Aug. 2008: available at: <http://drugtopics.modernmedicine.com/drugtopics/Government+And+Law/State-laws-requiring-PBM-transparency-see-some-gai/ArticleStandard/Article/detail/534603. The district court case is *Pharm. Care Mgmt. Ass'n v. District of Columbia,* No. 1:04-cv-01082-RMU (D.D.C.). See also *Pharm. Care Mgmt. Ass'n v. District of Columbia,* 522 F.3d 443 (D.C. Cir. 2008) (remanding case to district court).

101. Pharmaceutical Care Management Association (PCMA). "PCMA President Mark Merritt Testifies before Senate Finance Committee, Identifies Six Key Issues for Policymakers in Medicare Drug Benefit Rules." *Press Release.* 14 Sep. 2004: available at <http://pcrmanet.org/pcma-president-mark-merritt-testifies-before-senate-finance-committee-identifies-six-key-issues-for-policymakers-in-medicare-drug-benefit-rules/>.

102. *Beeman v. Caremark, Inc.,* No. 5:02-cv-01327-VAP (C.D. Cal.); see also *Beeman v. TDI Managed Care Services, Inc.,* 449 F.3d 1035 (9th Cir. 2006) (remanding case to district court).

103. Krasner, Jeffrey. "CVS, Caremark to merge, create drug giant – Analysts question whether \$21b deal will aid consumers." *The Boston Globe.* 2 Nov. 2006, quoting Health Care Policy Professor Richard Frank, Harvard Medical School.

104. *Prescription Drug Trends,* Kaiser Family Foundation. Sept. 2008: at pp. 1, 5, available at <http://www.kff.org/rxdrugs/upload/3057_07.pdf >.

105. State Auditor's Office, Texas. "An Audit Report on Pharmacy Benefit Manager Contracts at Selected State Agencies and Higher Education Institutions." Report No. 08-042. Aug. 2008: at 24.

106. *Id.* at p. 22.

107. *Id.* at p. i.

108. Chenango County, New York. *AdvancePCS Health, L.P. Managed Pharmacy Benefit Services Agreement.* 1 Jan. 2005: at Exhibit B – Fees, p. 24; Genesee County, Michigan. *Proposal for Pharmacy Benefit Management and Specialty Pharmacy Management Services for Genesee County, submitted by the AFL-CIO Employer Purchasing Coalition (AEPC) and Caremark.* 7 Feb. 2008: at Appendix A-2 – Pharmacy Network Claims Cost – Binding for One Year, p. 2.

109. Albany County, New York. *An Actively Managed Prescription Benefit Program for the County of Albany, submitted by EHS Pharmacy Benefit Services.* 1 Oct. 2004: at p. 1 of Section V (Cost Proposal, County of Albany, Pricing Summary); Kent County, Michigan. *Prescription Benefit Services Agreement with CaremarkPCS Health.* 1 Jan. 2008: at Exhibit B – Fees, p. 27.

110. Some contracts include multiple pricing options; in such cases, this table reflects the option that provides plans with the largest discounts . Albany County, New York. *An Actively Managed Prescription Benefit Program for the County of Albany, submitted by EHS Pharmacy Benefit Services.* 1 Oct. 2004: at pp. 1 and 2 of Section V (Cost Proposal, County of Albany, Pricing Summary); Chenango County, New York. *AdvancePCS Health, L.P. Managed Pharmacy Benefit Services Agreement.* 1 Jan. 2005: at Exhibit B – Fees, p. 24; Genesee County, Michigan. *Proposal for Pharmacy Benefit Management and Specialty Pharmacy Management Services for Genesee County, submitted by the AFL-CIO Employer Purchasing Coalition (AEPC) and Caremark.* 7 Feb. 2007: at Appendix A-2 – Pharmacy Network Claims Cost – Binding for One Year, p. 2; Kent County, Michigan. *Prescription Benefit Services Agreement with CaremarkPCS Health.* 1 Jan. 2008: at Exhibit B – Fees, p. 27; San Antonio Water System, Texas. *Prescription Benefit Services*

*Agreement between San Antonio Water System and CaremarkPCS Health, L.P.* 1 Jan. 2006: at pp. 18-19.

111. Some contracts include multiple pricing options; in such cases, this table reflects the option that provides plans with the largest discounts (i.e. the option that would cost the least). "AWP" means the 'average wholesale price' for a standard package size of a prescription drug from the most current pricing information provided to Caremark by First DataBank®, Medi-Span Prescription Pricing Guide (with supplements), or any other nationally available reporting service of pharmaceutical prices as selected by Caremark." This language. or language substantially similar, is in the majority of Caremark contracts we reviewed.

112. Adler, Meredith. Lehman Brothers, Food & Drug Retailing Analyst Report. *CVS Corporation: Change of Earnings Forecast.* 1 Aug. 2008: at p. 3.

113. Drury, Susan. "Drug Pushing."

114. Concerns about using Caremark and its predecessor, AdvancePCS, identified by the University included: "The account management, member (customer) service performance, and data systems capabilities have been less than expected from an industry leader. . . . As a result, UM Benefits Office has seen increased administrative workloads and received member complaints," plus "Conflicts with preferred drug lists by prior contracting arrangements with drug manufacturers," "Clinical intervention programs inconsistent with member, physician and University directives," and "Physician complaints about marketing drug promotions in local networks, impacts UM cost." University of Michigan Benefits Office. *Overview of Prescription Drug Plan Implemented in CY2003.* Draft Working Paper. 14 Apr. 2004: at pp. 8-9; see also Wessel, David, Bernard Wysocki Jr., and Barbara Martinez. "As Health Middlemen Thrive, Employers Try to Tame Them."

115. University of Michigan Benefits Office. *2007 Prescription Drug Plan Annual Report.* 22 Jan. 2008: at pp. 1 and 2; see also: University of Michigan Benefits Office. *2006 Prescription Drug Plan Annual Report.* 6 Feb. 2007: at p. 1.

116. The BlueCross BlueShield Association subcontracted with AdvancePCS to provide retail pharmacy benefits and process pharmacy claims, and to make payments to retail pharmacy providers on its behalf. See: Unites States Office of Personnel Management, Office of the Inspector General. *Final Audit Report: Report on the Audit of AdvancePCS.* Office of Audits. Report No. 1H-01-00-04-100. Washington. 30 Mar. 2006: at p. 6 and Executive summary. Unites States Office of Personnel Management, Office of the Inspector General. *Final Audit Report: Report on the Audit of AdvancePCS.* at p. 6.

117. *United States ex rel. Brown,* SAC: at ¶ 51.

118. Miller, James P. "CVS Caremark settles deceptive-practices complaint for \$38.5 million: Deceptive practices alleged by 28 states." *Chicago Tribune.* 15 Feb. 2008.

119. *Illinois v. Caremark Rx, L.L.C.,* Complaint: at ¶¶ 20, 22.

120. *Id.* ¶ 37 (d).

121. Won Tesoriero, Heather, and David Armstrong. "CVS Caremark Reaches Settlement." See also: *United States ex rel. Lisitza,* Complaint: at ¶ 36.

122. *United States ex rel. Ramadoss v. Caremark Rx, Inc.,* No. SA-99-CA-914-WRF (W.D. Tex.) Complaint in Intervention of the United States, and the States of Texas, Florida, Arkansas, and Tennessee. 19 Aug. 2005: at pp. 10-11.

123. *SEPTA,* Amended Complaint: at pp. 7-8.

124. Shehane, Julie. "Hardin County Settles \$40,000 Dispute with CVS." *BeaumontEnterprise.Com.* 26 Jul. 2008: available at <http://www.beaumontenterprise.com/community-news/hcn/local/27510284.html>.

125. *New York State Teamsters Council Health and Hospital Fund v. Caremark Inc.,* No. 06-cv-01273 (N.D. N.Y.) Complaint. 7 Sep. 2006: at p. 8.

126. *Kindred Healthcare Inc.,* Complaint: at p. 6.

127. *Kindred Healthcare Inc.,* Agreed Order Dismissing Action With Prejudice. 18 Apr. 2008.

128. *State of California ex rel. Fowler v. Caremark Rx, Inc.,* (Second Amended Complaint). 18 Apr. 2005: at ¶ 155.

129. *Illinois v. Caremark Rx, L.L.C., Complaint:* at p. 6; *State of California ex rel. Fowler, SAC:* at ¶ 27; 11 News Defenders. "Caremark Investigation Part 2": at 11:30 (Interview with Jessie Garcia, former Caremark employee).

130. Office of the Illinois Attorney General. "Madigan, 28 Attorneys General Reach Settlement with Caremark for Drug Switching Practices"; see also: *State of Washington v. Caremark Rx, LLC.* Consent Decree: at p. 32, ¶ D (1).

131. *State of California ex rel. Fowler, SAC:* at pp. 5-17.

132. *Id.* at pp. 9-10, ¶¶ 40-43.

133. *Id.* at pp. 7,10, ¶¶ 28-29, 46.

134. *11 News Defenders.* "Caremark Investigation Part 2."

135. *Id.* (Interview with Jessie Garcia, former Caremark employee).

136. *State of California ex rel. Fowler, SAC:* at pp. 10-12.

137. *Id.* at p. 8, ¶ 34 (emphasis added).

138. *Id.* at p. 8, ¶ 35 (emphasis added).

139. *New York State Teamsters Council Health and Hospital Fund, Complaint:* at ¶¶ 21, 23.

140. *Id.* at ¶ 60 (emphasis added).

141. *Id.* at ¶¶ 2, 24-26.

142. *New York State Teamsters Health & Hospital Fund, Stipulation of Dismissal.* 30 Apr. 2007.

143. *Kindred Healthcare Inc., Complaint:* at p. 10.

144. *Id.* at p. 4, ¶ 10 (emphasis added).

145. *Id.* at pp. 5-6, ¶¶ 11, 19.

146. *Kindred Healthcare Inc., Complaint:* at ¶¶ 13-14.

147. *Kindred Healthcare Inc., Agreed Order Dismissing Action With Prejudice.* 18 Apr. 2008.

148. *Shields v. National Automatic Sprinkler Industry Welfare Fund et al.,* No. 08-CV-00285, W.D. KY (Verified complaint). 2 May 2008: at p. 3, ¶ 8.

149. *Id.* (Docket as of 26 Sep. 2008).

150. Accordant – A Caremark Company. *Caremark Prescription Service.* Verbatim Comments. *State of Florida, Quarter 1 and 2, 2007; Plan Participant Satisfaction Study.*

151. *Id.* at p. 00248.

152. *Id.* at p. 00250.

153. *Id.* at p. 00254.

154. *Id.* at p. 00098.

155. *Id.* at p. 00255.

156. *Id.* at p. 00278.

157. *Id.* at p. 00280.

158. Armstrong, David, and Barbara Martinez. "CVS, Caremark Unite to Create Drug-Sale Giant." *The Wall Street Journal.* 2 Nov. 2006: at p. B1 (emphasis added).

159. *CVS Caremark Power of One Slide Presentation:* at slide 21.

160. *CVS Caremark Power of One Slide Presentation:* at slides 15, 21, 29; see also: *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript* (Statement of Nancy Christal): at p. 4; Armstrong, David, and Amy Merrick. "CVS to Buy Longs Drug For About $2.6 Billion." *The Wall Street Journal.* 13 Aug. 2008.

161. *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript* (Statement of Helena Foulkes): at p. 18 (referring to 2009 core offerings, described at pp. 15-18).

162. *CaremarkPCS Health, L.P. v. Walgreen Co.,* Plaintiff's Verified Complaint for Injunctive Relief. 6 Nov. 2007: at pp. 7-8; Bloomberg News. "CVS sues rival over pharmacy pact." *The Boston Globe.* 8 Nov. 2007: available at <http://www.boston.com/business/globe/articles/2007/11/08/cvs_sues_rival_over_pharmacy_pact/>.

163. *CaremarkPCS Health, L.P. v. Walgreen Co., Complaint:* at ¶¶ 33-34 (alleging Walgreen informed Caremark on October 24th it would

stop filling prescriptions); Order of Dismissal dated Nov. 29. 2007 (in favor of arbitration); Walgreens.com. "Low Payments by CVS Caremark Force Walgreens to Withdraw as a Provider from Four Insurance Plans." *Press Release.* 29 Nov. 2007: available at <http://news.walgreens. com/article_display.cfm?article_Id=4885>.

164. Gonzalez, Gloria. "Retailer battles rival over Rx payment rate." *Business Insurance.* 10 Dec. 2007: available at <http://www.businessinsurance.com/cgi-bin/article.pl?article_id=23604> (emphasis added).

165. *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript* (Statement of Jon Roberts, CVS Caremark Senior VP and CIO): at p. 34.

166. Caremark. *Preferred Provider Arrangement – Annual Renewal.* Sample Proposal for an integrated Prescription Drug Program. Submitted to the Maine Bureau of Insurance. 4 Apr. 2005: at p. 1."

167. *Proposal for PBM Services for Genesee County, MI from Automated Benefit Services and Caremark.* Cover letter from Jason Klein (Caremark) to Cindy Carnes, Genesee County Purchasing Department. 7 Feb. 2008.

168. Caremark Corporation. *Form 10-K for the year ended Dec. 31, 2004,* filed 3 Mar. 2005 with SEC: at p. 5; Employers Health Purchasing Corporation of Ohio, Ohio. *Prescription Benefit Management Agreement with Caremark, Inc.* 1 June 2004: at p. B-2.

169. Armstrong, David, and Barbara Martinez. "CVS, Caremark Unite to Create Drug-Sale Giant." Emphasis added.

170. *CVS Caremark Power of One Slide Presentation:* at slide 63.

171. CVS/Caremark, Press Release, "CVS Caremark to Present Insights on Redefining the Consumer Health Care Experience at AHIP Institute 2008"; Gebhart, Fred. "CVS Caremark unveils new pharmacy model." *Drug Topics* 14 July 2008; CVS Caremark Corporation. *TrendsRx: Report 2008.* "Introducing Proactive Pharmacy Care." Apr. 2008.

172. *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript* (Statement of Helena Foulkes): at p. 18; CVS Caremark Corporation. *TrendsRx: Report 2008.* "Introducing Proactive Pharmacy Care." Apr. 2008: at p. 13; *CVS Caremark Power of One Slide Presentation:* slide 58; CVS Caremark. "CVS Caremark to Present Insights on Redefining the Consumer Health Care Experience at AHIP Institute 2008." *Press Release;* Gebhart, Fred. "CVS Caremark unveils new pharmacy model."

173. CVS Caremark Corporation. *TrendsRx: Report 2008:* at p. 13.

174. Krasner, Jeffrey. "CVS, Caremark to merge, create drug giant – Analysts question whether $21b deal will aid consumers"; *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript* (Statement of Helena Foulkes): at p. 16.

175. CVS Caremark. "CVS Caremark to Present Insights on Redefining the Consumer Health Care Experience at AHIP Institute 2008." *Press Release.*

176. *Id.*

177. "High Noon for Cigarettes." Editorial. *Boston Globe.* 7 Sep. 2008; McIlvaine, Andrew R. "Analysts Mixed on CVS/Caremark Merger: The merger indicates an ongoing consolidation in the industry. Analysts are unsure if it will affect prices." *Human Resource Executive.* 14 Nov. 2006: available at <http://www.hrexecutive.com/HRE/story.jsp?storyId=8164980>.

178. McIlvaine, Andrew R. "Analysts Mixed on CVS/Caremark Merger."

179. "High Noon for Cigarettes." *Boston Globe;* Zimmerman, Anne. "Drugstore Tobacco Sales Under Fire." *The Wall Street Journal.* 29 Jul. 2008.

180. Gbeckley. "CVS Weight Loss." Flickr posting. Uploaded 9 Apr. 2007. Flickr. May 2008: available at <http://www.flickr.com/photos/7726334@N03/452662295/in/pool-63543126@N00>.

181. CVS Caremark Corporation. *TrendsRx: Report 2008:* at p. 9.

182. Jaret, Peter. Consumer Health Interactive. "Ills & Conditions – Special Report: Avoiding Pharmacy Errors." CVS Caremark. Last updated: 1 Feb. 2008, available at <https://www.caremark.com/wps/portal/HEALTH_RESOURCES?topic=rxtrouble>.

183. CVS Caremark Corporation. *TrendsRx: Report 2008*: at pp. 13, 20.

184 *Illinois v. Caremark Rx, L.L.C.*, Complaint: at ¶¶ 20-23; see also *United States ex rel. Brown*, SAC: at p. 11.

185. See *United States ex rel. Lisitza*, Settlement Agreement and Complaint.

186. *Bid proposal by CVS Caremark to Employees Retirement System of Texas*, Section X, Interrogatories. 2007: at p. 1.

187. *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript* (Statement of Thomas Ryan): at p. 7.

188. *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript* (Statement of Nancy Christal): at p. 7.

189. CVS Caremark Corporation. *Form 10-K for year ended Dec. 31, 2007*: at p. 3; CVS Corporation. *Form 425 filed with the U.S. Securities and Exchange Comm'n.* 2 Nov. 2006 (Statement of Mac Crawford): at pp. 10-11.

190. *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript* (Statement of Helena Foulkes): at p. 16; see also *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript* (Statement of Jon Roberts): at p. 36; CVS Caremark Corporation. *Form 10-K for year ended Dec. 31, 2007.*

191. CVS Corporation. *Form 425 filed with the U.S. Securities and Exchange Comm'n.* 2 Nov. 2006 (Statement of Mac Crawford, Conference Call Transcript): at pp. 10-11.

192. *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript* (Statement of Jack Bruner, CVS Caremark's Executive Vice President of Strategic Development and Marketing): at pp. 10-11.

193. *Conference Call Transcript: CVS Corporation at Morgan Stanley Global Consumer & Retail Conference.* 15 Nov. 2006 (Statement of Dave Rickard): at pp. 6-7.

194. *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript* (Statement of Helena Foulkes): at p. 16.

195. CVS/Caremark. "CVS Caremark to Present Insights on Redefining the Consumer Health Care Experience at AHIP Institute 2008." *Press Release.*

196. *CVS - CVS Caremark Corporation 2008 Analyst/Investor Meeting Transcript* (Statement of Helena Foulkes): at p. 17.

197. As discussed above, CVS Caremark's PBM contracts generally allow the sale of consumer data. See, e.g., Montgomery County Public Schools, Maryland. *Prescription Services Agreement with Caremark.* 1 Jan. 2005: at p. 8. Regarding data selling by PBM industry generally, see *IMS Health Inc.*, Declaration of CVS Caremark Corporation. 30 Aug. 2007: at pp. 2-3, ¶¶ 5-10; Terhune, Chad. "They Know What's in Your Medicine Cabinet." *Business Week.* 23 Jul. 2008.

198. See, e.g.: Pharmacy Benefit Consultants. "Reverse Your Rx Drug Trends." Pharmacy Benefit Consultants, PC. 2005: available at <http://www.pharmacybenefitconsultants.com/reverse-your-rx-drug-trends>; Pharmacy Outcome Specialists. "Services – For Plan Sponsors": available at <http://www.pharmout.com/pbm_auditors.html>.

199. Pharmacy Benefit Consultants. "Eliminate Consulting Firms' Conflicts of Interest." Pharmacy Benefit Consultants, PC. 2005: available at <http://www.pharmacybenefitconsultants.com/eliminate-consulting-firms-conflicts-of-interest>.

200. Keel, John. State Auditor's Office, Texas. "An Audit Report on Pharmacy Benefit Manager Contracts at Selected State Agencies and Higher Education Institutions": at p. 17.

201. Pharmacy Benefit Consultants. "Reverse Your Rx Drug Trends"; see also: Keel, John. State Auditor's Office, Texas. "An Audit Report on Pharmacy Benefit Manager Contracts at Selected State Agencies and Higher Education Institutions": at p. 8 ("Agencies and higher education institutions should ensure that either allowing or prohibiting therapeutic interchange is to the benefit and interest to their plans and their plans' members.").

202. Keel, John. State Auditor's Office, Texas. "An Audit Report on Pharmacy Benefit Manager Contracts at Selected State Agencies and Higher Education Institutions": at p. 5.

203. National Community Pharmacists Association. *Laws That Provide Regulation of the Business Practices of Pharmacy Benefit Managers.* 4 Jun. 2008: at pp. 4-6, 12-13, available at <http://www.ncpanet.org/pdf/leg/leg_pbm_business_practice_regulati on.pdf>.

204. Bernard Wysocki Jr., and Barbara Martinez. "As Health Middlemen Thrive, Employers Try to Tame Them."

205. Martin, Steven S. "PBM Industry Today: Who's Managing Drug Costs?"; see also: *State of Ohio v. Caremark Rx, L.L.C.*, Complaint: at p. 5; *United States ex rel. Brown*, SAC: at p. 11; Drury, Susan. "Drug Pushing."

206 Kaiser Family Foundation. *Follow The Pill*: at p. 21.

207. *Id.* at pp. 19, 23.

208. CVS Caremark defines "formulary" in its contracts, for example see: *Managed Prescription Drug Program Participating Group Agreement between CaremarkPCS and Michigan State University.* 1 Feb. 2007: at p. 3, "'Formulary' mean the lists of preferred drugs and supplies and/or the list of FDA-approved prescription drugs and supplies developed by PBM's Pharmacy and Therapeutics Committee, as amended from time to time, as customized and or added to by Participating Group which classifies items for purposes of Plan design and coverage decisions. In the event Participating Group deviates from PBM's recommended Formulary, Participating Group acknowledges PBM may revise certain pricing terms."; In addition, a number of lawsuits have alleged improper payments from drug companies in order to gain entry to Caremark's preferred drug list, see: *United States ex rel. Brown*, SAC: at pp. 6-8. CVS Caremark acknowledges that it receives several different types of payments from drug companies, see for example: *Proposal for PBM Services for Genesee County, MI from Automated Benefit Services and Caremark.* 7 Feb. 2008: at p. 78. For accurate audits of PBMs require full disclosure of drug company revenues, according to experts, see for example: Keel, John. State Auditor's Office, Texas. *An Audit Report on Pharmacy Benefit Manager Contracts at Selected State Agencies and Higher Education Institutions*: at p. 5.

209. Kaiser Family Foundation. *Follow The Pill*: at pp. 21-22.

210. Garis, Robert I. and Bartholomew E. Clark. *The Spread*; Prime Therapeutics. "Prime Therapeutics Supports CMS Proposal to Limit Spread Pricing in Medicare Part D Administration"; Sipkoff, Martin. "PBMs Raise the Curtain."

211. Sipkoff, Martin. "PBMs Raise the Curtain"; *United States ex rel. Brown*, SAC: at pp. 18-19; *SEPTA v. CaremarkPCS Health L.P.*, Amended Complaint: at p. 4.

212. U.S. Government Accountability Office. *Federal Employees' Health Benefits*: at pp. 25-28; *United States ex rel. Brown*, SAC: at pp. 12, 15; Sipkoff, Martin. "PBMs Raise the Curtain."

213. For a description of drug company payments for PBM educational services, see: *Proposal for PBM Services for Genesee County, MI from Automated Benefit Services and Caremark.* 7 Feb. 2008: at p. 78. For an example of PBM educational materials sent to prescribing physicians and paid for by a pharmaceutical company, see: CVS Caremark. *RxReview: New Trends in Prescription Therapies, Benefits & Costs.* Letter mailed by CVS Caremark to Arizona physician. For a description of the services PBMs provide to drug companies, see: U.S. Government Accountability Office. *Federal Employees' Health Benefits*: at pp. 27-28.

214. See, e.g., *United States ex rel. Brown*, SAC: pp. 6-14; *State of Ohio v. Caremark Rx, L.L.C.*, Complaint: at pp. 5-6.

215. Martin, Steven S. "PBM Industry Today: Who's Managing Drug Costs?"; U.S. Government Accountability Office. *Federal Employees' Health Benefits*: at pp. 25-28.

216. American Pharmacies. *Medicine and Money: Pharmacists Reveal The Truth About Prescription Drug Costs.* July 2008: available at: <http://medicineandmoney.com/voters/pbm-lawsuits.html>.

# Endnotes: Appendix B

Prescription Benefit Services Agreement between Caremark and Health Action Council of Northeast Ohio, "Exhibit A: Financial Terms." 1 Jan. 2006: at pp. 24-27. International Foundation of Employee Benefit Plans. "2007 Directory, Health Care Purchasing Coalitions: Multiemployer and Public Plans." 2007: at p. 30 (Covered Lives).

Prescription Benefit Management Agreement between Caremark and Employers Health Purchasing Corporation of Ohio. 1 Jun, 2004: at B2-B4, E1, "Exhibit B – Participating Group Payments"; "Exhibit E – Formulary Payments to EHPCO on Behalf of Participating Group"; "History of EHPCO": available at <http://www.ehpco.com/historyofecho.html> (Covered Lives).

Pharmacy Benefit Management Services Contract between the Kansas State Employees Health Care Commission and Caremark PCS. 1 Jan. 2007: at ¶ A (chart, 7-10), "Exhibit E – Prescription Reimbursement Formula and Credits"; Caremark. RxInsights: Kansas State Employees, Prescription Benefit Review. Jun 2007: at p. 6 (Covered Lives).

Prescription Benefit Services Agreement between Caremark and Montgomery County Public Schools. 1 Jan. 2005: at pp. 19-20. "Appendix A: Financial Terms"; Montgomery's Best Honor Awards Program 2006. Apr 2007: at p. 56 of 77 (Covered Lives).

Caremark pricing proposal to Houston Independent School District. 24 Nov. 2004: at pp. 1-2. Data on covered lives are not available for the Houston Independent School District, so number of employees was used; the Houston Independent School District has approximately 29,000 employees. Houston Independent School District. "General District Information": available at <http://www.houstonisd.org/HISDConnectDS/v/index.jsp?vgnextoid= 4ca708f860efc010VgnVCM10000052147fa6RCRD&vgnextchannel= 2e2b2f796138c010VgnVCM10000052147fa6RCRD>.

Amendment 0620474-01/Contract 0620474: The City of Philadelphia with AdvancePCS Health, LP DB, Caremark, "Exhibit B – Financial Terms". January 1, 2007: at pp. 60-61. Information on covered lives is not available for the city of Philadelphia; in 2007, the City of Philadelphia had 28,117 employees. City of Philadelphia. Comprehensive Annual Financial Report, Fiscal Year Ended June 30, 2007: at p. 163.

Pharmaceutical Benefit Management Agreement between City of Austin and Caremark. 1 Jan. 2004: at pp. 1, 21-24, "Exhibit A – Pricing and Credits"; "Attachment A – Section III of Proposal, Scope of Work" (Covered Lives).

Pharmacy Benefit Services Agreement between Caremark and the County of Onondaga, New York, "Exhibit A – Financial Terms," January 1, 2007: 18-19; CVS Caremark. Utilization Summary. April 22, 2008: at pp.1-2.

Pharmacy Benefit Services Agreement between Caremark and City of Phoenix. 1 Aug. 2005: at pp. 16-17. Information on covered lives is not available for the City of Phoenix; in 2006, the City of Phoenix had 14,149 employees. City of Phoenix, Arizona. Comprehensive Annual Financial Report for the fiscal year 2006. 2006: at p. 251, "Exhibit B - Financial Terms," available at <phoenix.gov/ftpalias/FINANCE/cafrfy06.pdf>.

EHS Services (acquired by PharmaCare). "Proposal for County of Albany: Pricing Summary." 1 Oct. 2004: at pp. 1-2, 37; Caremark. "County of Albany Utilization Summary." 5 Feb. 2008: at p. 1 (Covered Lives).

Proposal for PBM Services for Genesee County, MI from Automated Benefit Services and Caremark. 7 Feb. 2008: at pp. 77-81; Proposal for PBM Services for Genesee County, MI from Valued Pharmacy Services and Caremark. 7 Feb. 2008: at p. 14 (Covered Lives). Note: Genesee County received three separate bids from entities partnered with Caremark, offering different pricing proposals.

Proposal for PBM Services for Genesee County, MI from AFL-CIO Employer Purchasing Coalition and Caremark. 7 Feb. 2008: at pp. 2-4, 65; Proposal for PBM Services for Genesee County, MI from Valued Pharmacy Services and Caremark. 7 Feb. 2008: at p. 14 (Covered Lives).

Proposal for PBM Services for Genesee County, MI from Valued Pharmacy Services and Caremark. 7 Feb. 2008: at pp. 2-4, 14, 65, 14 (Covered Lives).

Pharmacy Benefit Services Agreement between Kent County, MI and Caremark. 1 Jan. 2008: at p. 27, "Exhibit B – Fees"; Data on covered lives are not available for Kent County; in 2007, Kent County had 1,973 employees. Kent County Fiscal Services. Comprehensive Annual Financial Report, year ended December 31, 2007. 2007: at p. 183.

Contract between Bethlehem Area School District and Caremark. "Pricing Implementation Document." 18 Jan. 2008: at p. 1. Data on covered lives are not available for the Bethlehem Area School District. Bethlehem Area School District has 2,148 employees. Bethlehem Area School District. "About Bethlehem Area School District": available at <http://www.beth.k12.pa.us/admin/district/about.lesso>.

Prescription Benefit Services Agreement between CaremarkPCS Health, L.P. and San Antonio Water System, "Exhibit A – Financial Terms". January 1, 2008: at p. 19-19. Data on covered lives are not available for the San Antonio Water System; in 2006, the San Antonio Water System had 1,575 employees. San Antonio Water System. 2006 Annual Report: at p. 6.

Pharmacy Benefit Services Agreement between Caremark and City of Columbia, MO. 1 Feb. 2007: at pp. 22-25, "Exhibit A - Pricing & Administrative Fees"; Data on covered lives are not available for the City of Columbia; in Fall 2007 the City of Columbia had 1,242 employees. Regional Economic Development, Inc. Columbia, Missouri. "Largest Employers." 29 Feb. 2008: at p. 1, available at <www.columbiaredi.com/area_data/LargestEmployers.php>.

Pharmacy Benefit Services Agreement between Advance PCS and Boone County, MO. 1 Jan. 2005: at "Pricing Terms Sheet". Figure for covered lives taken from MedTrak Pharmacy Service, presentation by Bart A. Hoolehan III to Boone County, MO (no date or page number) (stating that covered lives is estimated assuming 424 employees and a 1.57 dependent factor).

PBM contract between Chenango County, NY and Advance PCS. 1 Jan. 2005: at pp. 24-25, "Exhibit B – Fees"; Data on covered lives are not available; Chenango County has approximately 600 employees. Interview between Nell Geiser and Bonnie L. Carrier. Chenango County Personnel Officer. 9 Sept. 2008.



# CHANGE to WIN

www.ChangeToWin.org



www.AlarmedAboutCVSCaremark.org

*Contact Info:*

**info@alarmedaboutcvscaremark.org**
**(888) 790-0849**